UNITED STATES *v.* OLD SETTLERS.

OLD SETTLERS *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 1031, 1032. Argued December 13, 14, 1892. — Decided April 3, 1893.

Finding of facts by the Court of Claims, in a suit which Congress has authorized it to take jurisdiction of in equity, may be reviewed by this court.

Congress has not authorized the courts in this litigation to go behind the treaty of August 6, 1846, 9 Stat. 871, with the Cherokee Nation.

So far as there is a conflict between the treaties with the Cherokees and subsequent acts of Congress, the latter must prevail.

The contention made by the Western Cherokees as to the ownership of land to the west of the Mississippi was put to rest by the treaty of 1846, and cannot now be revived.

The rule that, when a party without force or intimidation and with a full knowledge of all the facts in the case, accepts on account of an unliquidated and controverted demand a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction, he will not be permitted to avoid his act on the ground of duress, does not apply in this case, as it is evident that Congress was convinced that a mistake had been made, and intended to afford an opportunity to have it corrected.

On examining the account between the United States and the Western Cherokees, this court finds some small errors in the statement of it as made by the Court of Claims, and, after correcting those errors, it agrees with the Court of Claims that interest should be allowed on all but a small part of it, and orders the judgment, as thus corrected, to be affirmed.

THE original petition was filed March 8, 1889, and the substituted petition, January 23, 1890, and thereby the petitioners, Bryan, Wilson and Hendricks, purporting to act for themselves, and as the commissioners of the "Old Settlers," or

" Western Cherokee" Indians, represented that the latter are that part of. the Cherokee race of Indians which formerly composed the Western Cherokee Nation, and which subsequently became known as the " Old Settlers," and that for the purpose of prosecuting their claims against the United States government they had appointed Bryan, Wilson and Hendricks as their commissioners to represent and in their names and for their benefit to do and perform any and all acts and things necessary and proper to be done by them in the premises; that the suit was brought under the provisions of the act of Congress approved February 25, 1889, entitled "An act to authorize the Court of Claims to hear, determine and render final judgment upon the claim of the Old Settlers or Western Cherokee Indians," 25 Stat. 694, c. 238, and which is as follows:

" That the claim of that part of the Cherokee Indians, known as the Old Settlers or Western Cherokees, against the United States, which claim was set forth in the report of the Secretary of the Interior to Congress of February third, eighteen hundred and eighty-three, (said report being made under act of Congress of August seventh, eighteen hundred and eighty-two,) and contained in Executive Document Number Sixty of the second session of the Forty-seventh Congress, be, and the same hereby is, referred to the Court of Claims for adjudication; and jurisdiction is hereby conferred on said court to try said cause, and to determine what sum or sums of money, if any, are justly due from the United States to said Indians, arising from or growing out of treaty stipulations and acts of Congress relating thereto, after deducting all payments heretofore actually made to said Indians by the United States, either in money or property; and after deducting all off-sets, counter-claims and deductions of any and every kind and character which should be allowed to the United States under any valid provision or provisions in said treaties and laws contained, or to which the United States may be otherwise entitled, and after fully considering and determining whether or not the said Indians have heretofore adjuste 3and settled their said claim with the United States, it being the intention of

this act to allow the said Court of Claims unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of said Indians, may be fully considered and determined; and to try and determine all questions that may arise in such cause on behalf of either party thereto and render final judgment thereon; and the Attorney General is hereby directed to appear in behalf of the government; and if said court shall decide against the United States, the Attorney General shall, within sixty days from the rendition of judgment, appeal the cause to the Supreme Court of the United States; and from any judgment that may be rendered, the said Indians may also appeal to said Supreme Court: *Provided,* That the appeal of said Indians shall be taken within sixty days after the rendition of said judgment, and said courts shall give such cause precedence: *Provided further,* That nothing in this act shall be accepted or construed as a confession that the government of the United States is indebted to said Indians.

"SEC. 2. That said action shall be commenced by a petition stating the facts on which said Indians claim to recover, and the amount of their claim; and said petition may be verified by the authorized agent or attorney of said Indians as to the existence of such facts, and no other statement need be contained in said petition or verification."

And it was thereupon averred that under the provisions of certain treaties, made and entered into in 1817 and 1819, the Western Cherokees, or Old Settlers, sold, ceded and relinquished, and there was conveyed to the United States, all their right, title and interest in and to all the lands belonging to them situated in the States east of the Mississippi, and in consideration thereof the United States sold them certain lands, situated in what is now the State of Arkansas; that in consideration of the subsequent sale and cession of the lands in Arkansas to the United States, and in further consideration of the removal of the Western Nation of Cherokees from the State of Arkansas, under the provisions of the treaties of May 6, 1828, and February 14, 1833, between the Western Cherokee Nation and the United States, the latter bargained, sold, ceded, relinquished

and conveyed, solely and exclusively to the Western Cherokee Nation, subsequently known as the Old Settlers, all the lands situated in the now Indian Territory, and described in the treaties of 1828 and 1833, and solemnly guaranteed the lands to them forever. That while in the peaceable and undisputed possession and enjoyment of the tract of land, in the now Indian Territory, the United States under the color of a pretended treaty with the Eastern Cherokee Nation in 1835, made and entered into without the knowledge or consent of the Western Cherokee Nation, and to which it was not a party, and from the provisions of which it was prevented from protecting itself by force and fraud on the part of the United States, granted to the Eastern Cherokees the same lands that were sold and conveyed to the Western Cherokee Nation, without the consent and against the wishes and in fraud and violation of the rights of the latter, and removed the Eastern Cherokees against their will and by force of arms from their homes east of the Mississippi, and located them upon the lands belonging to the Western Cherokees, thus depriving them of the sole use, right to and interest in the lands as guaranteed by treaty, and reserving to them only an interest in proportion to their numbers, they being but one-third of the whole Cherokee people; that from that time and continually thereafter the Western Cherokees protested against and resisted this invasion of their rights, until in 1846, when acting under duress of life, liberty and property, advantage being also taken by the United States of the fiduciary relations existing towards the Western Cherokees, and also of the condition of extreme impoverishment, destitution and want to which the Western Cherokees had been reduced by the United States, they were forced to make and enter into an agreement with the United States fraudulent in character, by the terms of which the consideration they were to receive was grossly inadequate to compensate them for their right to and interest in the lands, of which they had been unjustly deprived by the United States, and for the property destroyed and lost to them through the wrongful acts of the United States, and its default to comply with its treaty obligations. It was further alleged that the land so

bargained, sold, relinquished and conveyed to the Western Cherokees by the treaties of 1828 and 1833 contained in all 13,610,795.34 acres, and that the Western Nation of Cherokees formed but one-third of the whole Cherokee race, the Eastern Nation forming the other two-thirds; and that the amount of land owned by the Western Nation, which was appropriated by the United States and granted to the Eastern Nation of Cherokees under the provisions of the treaty of 1835, was the same part of the whole body of land as was the Eastern Nation of the whole body of the Cherokee people; and that, therefore, the United States took from the Western Cherokees and deprived them of the sole use, right, title and interest in and to two-thirds of 13,610,795.34 acres, amounting to the sum of 9,073,863.56 acres, and converted the same to the public use and benefit, the land being worth at the time it was so taken and converted the sum of $5,671,164.72½.

Petitioners further alleged that after the Eastern Cherokees had been forcibly removed into the country of the Western Cherokees through the wrongful acts of the United States, and because of its failure to protect the Western Cherokees according to treaty stipulations, property of great value was lost to them, to wit, of the value of $30,000; and further, that the only payments made to the Western Cherokees since the appropriation of their lands and the destruction of their property, were the sum of $532,896.90, appropriated by act of Congress of September 30, 1850, 9 Stat. 556, c. 91, a one-third interest in the sum of $500,000 given by the United States to the whole Cherokee people in common, by the treaty of 1835; and a one-third interest in 800,000 acres of land sold in common to the Cherokee people by the United States in the treaty of 1835, which was made exclusively with the Eastern Cherokee Nation for the sum of $500,000, at which valuation the Western Cherokees have been and still are held charged by the government for their one-third share.

It was further alleged that, under the provisions of the treaty of 1846, the sum of $5,600,000, which had been provided by the treaty of 1835, and a supplementary treaty thereto of 1836, was adopted and taken by the United States

as a basis of settlement of the claims of the Western Cherokees against the United States, from which amount certain sums were to be first deducted and of the residuum thus obtained the Western Cherokees were to be paid one-third according to their numerical proportion to the whole people, and that the charges to be made against the said " treaty fund" were to be limited to " proper" and legitimate charges, " excluding all extravagant and improper expenditures"; that the only legitimate charges against the treaty fund are among those enumerated in the 15th article of the treaty of 1835, as provided in the treaty of 1846, which proper charges were as follows, to wit: the amount invested as a general national fund, $500,000; the amount expended for 800,000 acres of land, $500,000; the amount expended for improvements, $1,540,572.27; the amount expended for ferries, $159,572.12; the amount expended for spoliations, $264,894.09; and that the $600,000 forming a part of the treaty fund was provided by article three of the supplemental treaty of 1836, for, among other things, the removal of the Eastern Cherokees; that out of this fund there were removed in number 2495; that of this number, 295 were chattels, to wit, slaves; that for the removal of personal property there was no provision made by the treaty; and that, therefore, the only proper expenditure for removal was for 2200 Eastern Cherokees at $20 each, according to the terms of article four of the treaty of 1846, amounting to $44,000.

It was also charged that by the fourth article of the treaty of May 6, 1828, 7 Stat. 311, there were 3343.41 acres reserved by the United States, which the latter agreed to dispose of and to apply the proceed thereof to the sole interest and benefit of the Western Cherokees, together with the value of certain agency improvements on the lands, and that the United States have failed and neglected to do so, and are, therefore, liable for the full value of the lands and agency improvements, in all, the sum of $9179.16¼.

It was further averred that, according to the foregoing itemized statement under article four of the treaty of 1846, their account with the United States should be stated as follows:

Statement of the Case.

| | DR. | CR. |
|---|---|---|
| "By 'treaty fund,' under 4th article, treaty 1846 | | $5,600,000 00 |
| To improvements | $1,540,572 27 | |
| " ferries | 159,572 12 | |
| " spoliations | 264,894 09 | |
| " additional lands | 500,000 00 | |
| " invested funds | 500,000 00 | |
| " removal 2200 Indians | 44,000 00 | |
| | $3,009,038 48 | $5,600,000 00 |
| | | 3,009,038 48 |

"Balance of 'treaty fund,' after proper reductions ......... $2,590,961 52
By ⅓ of the above balance, under terms of said 4th article
   of treaty of 1846 .................................... 863,653 84
To appropriation, act September 30, 1850 ................ 532,896 90

"Principal sum due under 4th article of treaty of 1846   $330,756 94"

Petitioners further alleged that under the provisions of the eleventh article of the treaty of 1846, and a resolution of the Senate of the United States of September 5, 1850, in pursuance thereof, they are entitled to interest at the rate of five per cent per annum upon whatever principal sum might be found due them from the 12th of June, 1838, until paid; wherefore it was prayed:

"First. That they be not held to be bound by the terms of the contract made and entered into by and between them and the defendants on the 6th day of August, 1846, and known as the treaty of 1846, as fully set forth above, and that they may be relieved of the onerous, unjust and inequitable provisions thereof, and that the defendants to this suit be decreed and adjudged to pay unto them the value of the lands belonging to them under the treaties of 1828 and 1833, as aforesaid, the sole right and title in and to, and use and benefit of which were taken from them by the said treaty of 1835 with the Eastern Cherokees, at the valuation of similar lands by the said treaty, to wit, the sum of 62½ cents per acre; in all, the sum of $5,671,164.72½, together with the additional sums of $30,000 and $9179.16¼, as set forth in paragraphs 8 and 11 of this petition, less one-third of the amounts paid for additional lands and the permanent investment fund, and the payment, $532,896.90, as set forth in the 9th paragraph of this petition;

amounting in all to $866,230.23⅛, showing a balance as follows:

|  | DR. | CR. |
|---|---|---|
| " By value of lands...................................... |  | $5,671,164 72½ |
| " property destroyed, etc.............................. |  | 30,000 00 |
| " value of lands and improvements in Arkansas ........ |  | 9,179 16¼ |
| To ⅓ price additional lands ................. | $166,666 66⅔ |  |
| " ⅓ permanent investment fund ............ | 166,666 66⅔ |  |
| " payment, act of September 30, 1850 ...... | 532,896 90 |  |
|  | $866,230 23⅛ | $5,710,343 88¼ |
|  |  | 866,230 23⅛ |
| " Balance ...............................................$4,844,113 65 |  |  |

" For this amount, together with interest, at the rate of 5 per centum per annum, from June 12, 1838, until paid, your petitioners ask for a decree.

" Second. That if this honorable court should hold that they are not entitled to the relief above prayed for, that the defendants be adjudged and decreed to pay unto your petitioners the sums of $330,756.94, under the provisions of the 4th article of the treaty of 1846, and $9179.16¼, under the provisions of the treaty of 1828, and the further sum of $30,000 for property destroyed, etc.; in all the sum of $369,936.10¼, with interest at the rate of five per centum per annum, from June 12, 1838, until paid.

" Third. That this honorable court will examine this case, with 'unrestricted latitude, . . . . so that the rights, legal and equitable, both of the United States and your petitioners, may be fully considered and determined,' and enter such a decree as equity and good conscience may dictate in the premises."

Upon the hearing the facts disclosed by the evidence, chiefly documentary, and set forth in substance in the findings and opinion of the Court of Claims, (27 Ct. Cl. 1,) may be sufficiently stated as follows:

The Cherokee Indians held, under the treaty of November 28, 1785, 7 Stat. 18, a considerable body of lands situated in the States of North Carolina, Tennessee, Georgia and Alabama.

On the 27th of December, 1817, a treaty between the United States and "the chiefs, headmen and warriors of the Cherokee Nation east of the Mississippi River and the chiefs, headmen and warriors of the Cherokees on the Arkansas River, and their deputies," was proclaimed, in the preamble to which it is recited that in 1808, there being dissatisfaction on the part of a portion of the nation who wished to continue the hunter life and to remove across the Mississippi River on vacant lands of the United States, a representation to that effect was made to the authorities at Washington, to which the President replied, January 9, 1809, that "those who wish to remove are permitted to send an exploring party to reconnoitre the country on the waters of the Arkansas and White Rivers, and the higher up the better, as they will be the longer unapproached by our settlements, which will begin at the mouths of those rivers," and that "when this party shall have found a tract of country suiting the emigrants, and not claimed by other Indians, we will arrange with them and you the exchange of that for a just portion of the country they leave, and to a part of which, proportioned to their numbers, they have a right."

It was further recited that the Cherokees had explored the country on the west side of the Mississippi and had settled down upon United States lands on the Arkansas and the White Rivers, and that these emigrants and those about to remove were ready to relinquish their proportionate rights in the lands East which they had left and were about to leave. Thereupon the cession of certain lands was made; a census of those Indians remaining East, and of those on the Arkansas, and removing there, or declaring their intention of doing so, was provided for; the annuity for 1818 was agreed to be divided in proportion to the numbers of the two parts of the nation; and the United States bound themselves to give as much land on the Arkansas and White Rivers as they had or might receive of the lands East, as the just proportion of that part of the nation on the Arkansas agreeably to their numbers; also, to give to all the poor warriors who might remove, one rifle and ammunition, one blanket, and one brass kettle or

beaver trap ; to furnish flat-bottomed boats and provisions to aid in removal, and to pay for improvements adding to the real value of the lands ceded. Treaty of July 8, 1817, 7 Stat. 156.

About one-third of the whole nation emigrated, and by the treaty of March 10, 1819, provision was made for the payment of one-third of the annuity to the Cherokees West and two-thirds to those East. 7 Stat. 195. The Indians who thus emigrated, with accessions down to 1835, were known as the "Old Settlers" or "Western Cherokees."

On May 28, 1828, a treaty was made with the "Chiefs and Headmen of the Cherokee Nation of Indians west of the Mississippi," by which it was agreed that the lands in Arkansas should be relinquished to the United States, and a new grant was made of seven million acres, with an outlet west, the whole amounting to 13,610,795.34 acres. The preamble recites : "Whereas, it being the anxious desire of the government of the United States to secure to the Cherokee Nation of Indians, as well those now living within the limits of the Territory of Arkansas, as those of their friends and brothers who reside in States east of the Mississippi, and who may wish to join their brothers of the West, *a permanent* home, and which shall, under the most solemn guarantee of the United States, be, and remain theirs forever — a home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a Territory or State, nor be pressed upon by the extension, in any way, of any of the limits of any existing Territory or State."

By Article 2, the United States agreed to possess the Cherokees with the land described west of the Arkansas, and by Article 3, the expenses of removal are provided for.

By the 4th article, the property and improvements connected with the Indian agency were to be sold under the direction of the agent, and the proceeds of the same to be applied in the erection, in the country to which the Cherokees were going, of a grist and saw mill for their use.

Article 8 stated that "The Cherokee Nation west of the

Mississippi, having, by this agreement, freed themselves from the harassing and ruinous effects consequent upon a location amidst a white population, and secured to themselves and their posterity, under the solemn sanction of the guarantee of the United States, as contained in this agreement, a large extent of unembarrassed country ; and that their brothers yet remaining in the States may be induced to join them and enjoy the repose and blessings of such a state in the future, it is further agreed, on the part of the United States, that to each head of a Cherokee family now residing within the chartered limits of Georgia, or of either of the States, east of the Mississippi, who may desire to remove West, shall be given, on enrolling himself for emigration, a good rifle, a blanket, and kettle and five pounds of tobacco ; (and to each member of his family one blanket;) also, a just compensation for the property he may abandon, to be assessed by persons to be appointed by the President of the United States. The cost of the emigration of all such shall also be borne by the United States, and good and suitable ways opened, and provisions procured for their comfort, accommodation and support by the way, and provisions for twelve months after their arrival at the agency," etc.    7 Stat. 311, 313.

A supplemental treaty with the Western Cherokees was proclaimed February 13, 1833, the purpose of which was to more clearly define the boundaries of the cession of 1828. By the 4th article, certain corn mills were to be erected in lieu of the requisition of article 4th of the prior treaty.    7 Stat. 465.

Efforts followed the treaty of 1828 to induce the Eastern Cherokees to remove West, but the consent of all could not be obtained.    The Eastern Cherokees became divided into two parties, the Ridge, or treaty party, and the Ross party, of which the latter was largely in the majority.    December 29, 1835, a treaty was made with " the chiefs, headmen and people of the Cherokee tribe of Indians," at New Echota, and proclaimed May 23, 1836, which referred in its second article to the treaties with the Western Cherokees of 1828 and 1833, as securing the conveyance of the seven million acres and the

outlet to the "Cherokee Nation of Indians," and recited that: "Whereas it is apprehended by the Cherokees that in the above cession there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west of the Mississippi, the United States, in consideration of the sum of five hundred thousand dollars therefor," thereby covenanted and agreed to convey eight hundred thousand acres more.

Articles 1, 8, 10 and 15 are as follows:

"ARTICLE 1. The Cherokee Nation hereby cede, relinquish and convey to the United States all the lands owned, claimed or possessed by them east of the Mississippi River, and hereby release all their claims upon the United States for spoliations of every kind, for and in consideration of the sum of five millions of dollars, to be expended, paid and invested in the manner stipulated and agreed upon in the following articles. But as a question has arisen between the commissioners and the Cherokees, whether the Senate in their resolution, by which they advised 'that a sum not exceeding five millions of dollars be paid to the Cherokee Indians for all their lands and possessions east of the Mississippi River,' have included and made any allowance or consideration for claims for spoliations, it is therefore agreed on the part of the United States that this question shall be again submitted to the Senate for their consideration and decision, and if no allowance was made for spoliations, that then an additional sum of three hundred thousand dollars be allowed for the same."

"ARTICLE 8. The United States also agree and stipulate to remove the Cherokees to their new homes, and to subsist them one year after their arrival there, and that a sufficient number of steamboats and baggage-wagons shall be furnished to remove them comfortably, and so as not to endanger their health, and that a physician, well supplied with medicines, shall accompany each detachment of emigrants removed by the government. Such persons and families as in the opinion of the emigrating agent are capable of subsisting and removing themselves shall be permitted to do so; and they shall be allowed in full for all claims for the same twenty dollars for

each member of their family; and in lieu of their one year's rations, they shall be paid the sum of thirty-three dollars and thirty-three cents if they prefer it.

" Such Cherokees also as reside at present out of the nation, and shall remove with them in two years west of the Mississippi, shall be entitled to allowance for removal and subsistence as above provided."

" ARTICLE 10.  The President of the United States shall invest in some safe and most productive public stocks of the country for the benefit of the whole Cherokee Nation who have removed or shall remove to the lands assigned by this treaty to the Cherokee Nation west of the Mississippi, the following sums as a permanent fund for the purposes hereinafter specified, and pay over the net income of the same annually to such person or persons as shall be authorized or appointed by the Cherokee Nation to receive the same, and their receipt shall be a full discharge for the amount paid to them, viz., the sum of two hundred thousand dollars, in addition to the present annuities of the nation, to constitute a general fund, the interest of which shall be applied annually by the council of the nation to such purposes as they may deem best for the general interest of their people.  The sum of fifty thousand dollars to constitute an orphans' fund, the annual income of which shall be expended towards the support and education of such orphan children as are destitute of the means of subsistence.  The sum of one hundred and fifty thousand dollars, in addition to the present school fund of the nation, shall constitute a permanent school fund, the interest of which shall be applied annually by the council of the nation for the support of common schools and such a literary institution of a higher order as may be established in the Indian country. . . . The United States also agree and stipulate to pay the just debts and claims against the Cherokee Nation held by the citizens of the same, and also the just claims of citizens of the United States for services rendered to the nation, and the sum of sixty thousand dollars is appropriated for this purpose, but no claims against individual persons of the nation shall be allowed and paid by the nation.  The sum of three hundred

thousand dollars is hereby set apart to pay and liquidate the just claims of the Cherokees upon the United States for spoliations of every kind, that have not been already satisfied under former treaties."

"ARTICLE 15. It is expressly understood and agreed between the parties to this treaty that after deducting the amount which shall be actually expended for the payment for improvements, ferries, claims for spoliations, removal, subsistence, and debts, and claims upon the Cherokee Nation, and for the additional quantity of lands and goods for the poorer class of Cherokees and the several sums to be invested for the general national funds; provided for in the several articles of this treaty, the balance, whatever the same may be, shall be equally divided between all the people belonging to the Cherokee Nation East according to the census just completed; and such Cherokees as have removed West since June, 1833, who are entitled by the terms of their enrolment and removal to all the benefits resulting from the final treaty between the United States and the Cherokees East, they shall also be paid for their improvements according to their approved value before their removal, where fraud has not already been shown in their valuation."

Article 11 provided for a commutation of the permanent annuity of ten thousand dollars for the sum of $214,000.

By Article 12, a committee was designated, "fully empowered and authorized to transact all business on the part of the Indians which may arise in carrying into effect the provisions of this treaty and settling the same with the United States," and it was provided "that the sum of one hundred thousand dollars shall be expended by the commissioners in such manner as the committee deem best for the benefit of the poorer class of Cherokees as shall remove West, or have removed West, and are entitled to the benefits of this treaty."

By Article 16, it was stipulated that the Cherokees should "remove to their new homes within two years from the ratification of this treaty," and by Article 17, that "all the claims arising under or provided for in the several articles of this treaty shall be examined and adjudicated by . . . such

commissioners as shall be appointed by the President of the United States for that purpose, and their decision shall be final, and on their certificate of the amount due the several claimants they shall be paid by the United States." 7 Stat. 478–486.

A controversy arising as to the deduction of the cost of removal from the five million dollars purchase money, a supplemental treaty was concluded and proclaimed with the other treaty, on the same day, namely, May 23, 1836, of which Articles 2 and 3 are as follows:

" ARTICLE 2. Whereas the Cherokee people have supposed that the sum of five millions of dollars fixed by the Senate in their resolution of — day of March, 1835, as the value of the Cherokee lands and possessions east of the Mississippi River was not intended to include the amount which may be required to remove them, nor the value of certain claims which many of their people had against citizens of the United States, which suggestion has been confirmed by the opinion expressed to the War Department by some of the Senators who voted upon the question; and whereas the President is willing that this subject should be referred to the Senate for their consideration, and if it was not intended by the Senate that the above-mentioned sum of five millions of dollars should include the objects herein specified, that in that case such further provision should be made therefor as might appear to the Senate to be just.

" ARTICLE 3. It is therefore agreed that the sum of six hundred thousand dollars shall be, and the same is hereby, allowed to the Cherokee people, to include the expense of their removal, and all claims of every nature and description against the government of the United States not herein otherwise expressly provided for, and to be in lieu of the said reservations and preëmptions, and of the sum of three hundred thousand dollars for spoliations described in the first article of the above-mentioned treaty. This sum of six hundred thousand dollars shall be applied and distributed agreeably to the provisions of the said treaty, and any surplus which may remain after removal and payment of the claims so ascertained shall be turned over and belong to the education fund. But it is ex-

pressly understood that the subject of this article is merely referred hereby to the consideration of the Senate, and if they shall approve the same, then this supplement shall remain part of the treaty."

Article 4 provided : " It is also understood and agreed that the one hundred thousand dollars appropriated in Article 12 for the poorer class of Cherokees, and intended as a set-off to the preëmption rights, shall now be transferred from the funds of the nation and added to the general national fund of four hundred thousand dollars, so as to make said fund equal to five hundred thousand dollars." 7 Stat. 488.

There was accordingly invested $714,000, $500,000 national fund, covering the various items before mentioned, and $214,000 commutation.

The five million six hundred thousand dollars was thenceforth commonly styled the treaty fund, though the six hundred thousand dollars was allowed with particular reference to the expense of removal.

The court having ruled the Secretary of the Interior to furnish from the official records of his department information, first, as to the number of acres of land ceded to the Cherokee Indians under the treaty of December 29, 1835, exclusive of the eight hundred thousand acres; and, second, the number of acres of land ceded and relinquished by the Cherokee Indians to the United States east of the Mississippi River under said treaty, the Secretary furnished a letter from the acting Commissioner of Indian Affairs to him, from which it appeared that the land by actual survey (except the Cherokee reservation, which was estimated) amounted to 13,610,795.34 acres, and that the number of acres stated in the patent issued December 31, 1838, to the Cherokee Nation for said land, the outlying boundaries of which had been surveyed, was 13,574,135.14, which included the seven million acres and the outlet as such ; and, further, that there were no data in the office of Indian Affairs from which an approximate estimate could be made of the number of acres of land ceded to the United States east of the Mississippi, but that a letter to the Secretary of War, dated February 27, 1833, gave an estimate of 6,730.000

acres, which was believed too large by nearly a million of acres.

The record contains a communication from commissioners appointed to settle claims under the treaty of 1835, addressed to the Secretary of War, under date of February 21, 1837, asking his opinion " of the true and fair construction of those provisions of the treaty which provide for claims of citizens of the United States for services rendered the Cherokee Nation," and saying, " we are not able to perceive any provision whatever for the payment of claims of the above description, except what is contained in the 10th article of the treaty, and which limits the amount which may be thus allowed to the sum of sixty thousand dollars."

The treaty of New Echota was signed by persons purporting to represent the Eastern Cherokees, and assent to its provisions was given by two delegates from the Western Cherokees. John Ross and his followers were absent from the council that adopted the treaty, and disputed its validity. The authority of the Western delegates was also denied. The Ridge or treaty party numbered some 2200, and they emigrated to the West, carrying with them 295 slaves, the cost of removal falling on the United States. The Eastern Cherokees, numbering 14,757, disavowed the treaty, and memorialized the President and Congress. The United States authorities then in effect offered that if they would remove to the Indian Territory the expense of their subsistence should not be charged against the $5,600,000. Early in 1838, the removal of these Indians by military force commenced, and by act of Congress of June 12, 1838, 5 Stat. 241, c. 97, $1,047,067 was appropriated to defray the expenses of their removal and subsistence. The whole of this appropriation was expended, and in addition the sum of $189,422.76. In August, 1838, on their way to the Indian Territory, the Eastern Cherokees last mentioned resolved in council " that the inherent sovereignty of the Cherokee Nation, together with the constitution, laws and usages of the same, are, and by the authority aforesaid, are hereby declared to be in full force and virtue, and shall continue so to be in perpetuity, subject to such modifications as

the general welfare may render expedient." Upon their arrival they refused to submit to the government of the Western Cherokees, but offered to unite in a general council which should frame a constitution and establish a government for all. The Western Cherokees declined to make this arrangement, and insisted that the Eastern Cherokees had entered their territory without their permission, and that their character was that of aliens or immigrants, subject to the constitution and laws theretofore existing in the Territory. A number of efforts followed to form a union, and at a popular convention in January, 1840, an act of union was ratified, which had been adopted in July, 1839. The validity of this act of union and of the ratification was denied, but the Cherokee Nation thereby created seems to have been recognized as lawful by the United States. However, between the years 1838 and 1846, the Cherokee country was the scene of intestinal disorders of the gravest character, destroying the rights and liberties of certain of the Cherokees and endangering the peace of the frontier.

June 18, 1846, the Western Cherokees agreed to submit their claims to a board of commissioners to be appointed by the President and Senate of the United States. The board was appointed, and arrived at and announced its conclusions after an elaborate presentation of the claims of the Western Cherokees.

On August 3, 1846, the delegates of the Western Cherokees informed the commissioners that they were willing to agree to the suggested basis of settlement, which they state as they understand it; and closed their letter by saying, "that they will always consider whatever money may be paid their people, under the provisions of the present treaty, will be received as a payment for their country west of the Mississippi, which they now relinquish to the whole nation. They do not acquiesce in the decision of the commissioners that their country became the property of the whole Cherokee people by virtue of the treaty of 1828, or any subsequent treaty, and, should the treaty now proposed fail, from any cause, it is their fixed determination to reassert their rights to the country secured to them by the treaty of 1833, and to prosecute their claim to

the same by all proper and lawful means in the power of a feeble and oppressed people "; and they ask that the letter be communicated to the President and Senate of the United States, with the other proceedings.

August 6, 1846, a treaty was concluded between the United States, by Edmund Burke, William Armstrong and Albion K. Parris, commissioners; the principal chief and delegates duly appointed by the Eastern Cherokees; the representatives of the treaty party; and the representatives of the Western Cherokees.   9 Stat. 871.

The preamble stated the reasons for the treaty as follows :

" Whereas serious difficulties have, for a considerable time past, existed between the different portions of the people constituting and recognized as the Cherokee Nation of Indians, which it is desirable should be speedily settled, so that peace and harmony may be restored among them; and whereas certain claims exist on the part of the Cherokee Nation, and portions of the Cherokee people, against the United States; therefore, with a view to the final and amicable settlement of the difficulties and claims before mentioned, it is mutually agreed by the several parties to this convention as follows, viz. : "

By Article 1, lands now occupied by the Cherokee Nation were secured to the whole Cherokee people ; by Article 2, it was provided that all differences theretofore existing between the several parties of the Cherokee Nation should be settled and adjusted; that all party distinctions should cease except so far as they should be necessary to carry out the treaty, and a general amnesty was thereby declared ; Article 3 related to certain reimbursements to be made by the United States to the five-million-dollar fund, with which it was not properly chargeable.

Articles 4 and 5 read as follows :

"ARTICLE 4. And whereas it has been decided by the board of commissioners recently appointed by the President of the United States to examine and adjust the claims and difficulties existing against and between the Cherokee people and the United States, as well as between the Cherokees themselves,

that under the provisions of the treaty of 1828, as well as in conformity with the general policy of the United States in relation to the Indian tribes, and the Cherokee Nation in particular, that that portion of the Cherokee people known as the 'Old Settlers,' or 'Western Cherokees,' had no exclusive title to the territory ceded in that treaty, but that the same was intended for the use of, and to be the home for, the whole nation, including as well that portion then east as that portion then west of the Mississippi; and whereas the said board of commissioners further decided that, inasmuch as the territory before mentioned became the common property of the whole Cherokee Nation by the operation of the treaty of 1828, the Cherokees then west of the Mississippi, by the equitable operation of the same treaty, acquired a common interest in the lands occupied by the Cherokees east of the Mississippi River, as well as in those occupied by themselves west of that river, which interest should have been provided for in the treaty of 1835, but which was not, except, in so far as they, as a constituent portion of the nation, retained, in proportion to their numbers, a common interest in the country west of the Mississippi, and in the general funds of the nation; and, therefore, they have an equitable claim upon the United States for the value of that interest, whatever it may be. Now, in order to ascertain the value of that interest, it is agreed that the following principles shall be adopted, viz.: All the investments and expenditures which are properly chargeable upon the sums granted in the treaty of 1835, amounting in the whole to five million six hundred thousand dollars, (which investments and expenditures are particularly enumerated in the 15th article of the treaty of 1835,) to be first deducted from said aggregate sum, thus ascertaining the residuum or amount which would, under such marshalling of accounts, be left for *per capita* distribution among the Cherokees, emigrating under the treaty of 1835, excluding all extravagant and improper expenditures, and then allow to the Old Settlers (or Western Cherokees) a sum equal to one-third part of said residuum, to be distributed *per capita* to each individual of said party of 'Old Settlers,' or 'Western Cherokees.' It is further agreed

that, so far as the Western Cherokees are concerned, in esti- mating the expense of removal and subsistence of an Eastern Cherokee, to be charged to the aggregate fund of five million six hundred thousand dollars above mentioned, the sums for removal and subsistence stipulated in the 8th article of the treaty of 1835, as commutation money in those cases in which the parties entitled to it removed themselves, shall be adopted. And as it affects the settlement with the Western Cherokees, there shall be no deduction from the fund before mentioned in consideration of any payments which may hereafter be made out of said fund; and it is hereby further understood and agreed that the principle above defined shall embrace all those Cherokees west of the Mississippi who emigrated prior to the treaty of 1835.

" In the consideration of the foregoing stipulation on the part of the United States, the ' Western Cherokees,' or ' Old Settlers,' hereby release and quit-claim to the United States all right, title, interest or claim they may have to a common property in the Cherokee lands east of the Mississippi River, and to exclusive ownership to the lands ceded to them by the treaty of 1833 west of the Mississippi, including the outlet west, consenting and agreeing that the said lands, together with the eight hundred thousand acres ceded to the Cherokees by the treaty of 1835, shall be and remain the common property of the whole Cherokee people, themselves included.

" ARTICLE 5. It is mutually agreed that the *per capita* allowance to be given to the ' Western Cherokees,' or ' Old Settlers,' upon the principle above stated, shall be held in trust by the government of the United States, and paid out to each individual belonging to that party or head of family, or his legal representatives. And it is further agreed that the *per capita* allowance to be paid as aforesaid shall not be assignable, but shall be paid directly to the persons entitled to it, or to his heirs or legal representatives, by the agent of the United States authorized to make such payments.

" And it is further agreed that a committee of five persons shall be appointed by the President of the United States from the party of ' Old Settlers,' whose duty it shall be, in conjunc-

tion with an agent of the United States, to ascertain what persons are entitled to the *per capita* allowance provided for in this and the preceding article."

Article 6 appropriated one hundred and fifteen thousand dollars for the indemnification of the treaty party; Article 7 related to the value of salines, which were the private property of individual Western Cherokees, and of which they were dispossessed; Article 8 provided for the payment to the Cherokee Nation of two thousand dollars for a printing press, etc., destroyed; five thousand dollars to be equally divided "among all those whose arms were taken from them previous to their removal West by order of an officer of the United States; and the further sum of twenty thousand dollars in lieu of all claims of the Cherokee Nation as a nation, prior to the treaty of 1835, except all lands reserved by treaties heretofore made for school funds."

Article 9 read thus:

"ARTICLE 9. The United States agree to make a fair and just settlement of all moneys due to the Cherokees, and subject to the *per capita* division under the treaty of 29th December, 1835, which said settlement shall exhibit all money properly expended under said treaty, and shall embrace all sums paid for improvements, ferries, spoliations, removal, and subsistence, and commutation therefor, debts and claims upon the Cherokee Nation of Indians, for the additional quantity of land ceded to said nation; and the several sums provided [for] in the several articles of the treaty, to be invested as the general funds of the nation; and also all sums which may be hereafter properly allowed and paid under the provisions of the treaty of 1835. The aggregate of which said several sums shall be deducted from the sum of six millions six hundred and forty-seven thousand and sixty-seven dollars, and the balance thus found to be due shall be paid over, *per capita*, in equal amounts, to all those individuals, heads of families, or their legal representatives, entitled to receive the same under the treaty of 1835, and the supplement of 1836, being all those Cherokees residing East at the date of said treaty and the supplement thereto."

Article 10 related to Cherokees still residing east of the Mississippi River.   Articles 11 and 12 were as follows:

"ARTICLE 11.  Whereas the Cherokee delegations contend that the amount expended for the one year's subsistence, after their arrival in the West, of the Eastern Cherokees, is not properly chargeable to the treaty fund; it is hereby agreed that that question shall be submitted to the Senate of the United States for its decision, which shall decide whether the subsistence shall be borne by the United States or the Cherokee funds, and if by the Cherokees, then to say whether the subsistence shall be charged at a greater rate than thirty-three $\frac{33}{100}$ dollars per head; and also the question whether the Cherokee Nation shall be allowed interest on whatever sum may be found to be due the nation, and from what date and at what rate per annum.

"ARTICLE 12.  The Western Cherokees, called 'Old Settlers,' in assenting to the general provisions of this treaty in behalf of their people have expressed their fixed opinion that, in making a settlement with them upon the basis herein established, the expenses incurred for the removal and subsistence of Cherokees, after the twenty-third day of May, 1838, should not be charged upon the five millions of dollars allowed to the Cherokees for their lands under the treaty of 1835, or on the fund provided by the third article of the supplement thereto; and that no part of the spoliations, subsistence or removal provided for by the several articles of said treaty and the supplement thereto, should be charged against them in their settlement for their interest in the Cherokee country east and west of the Mississippi River.   And the delegation of 'Old Settlers,' or 'Western Cherokees,' propose that the question shall be submitted with this treaty to the decision of the Senate of the United States, of what portion, if any, of the expenditures made for removal, subsistence and spoliations under the treaty of 1835 is properly and legally chargeable to the five-million fund.   And they will abide by the decision of the Senate."

The treaty was ratified by the Senate, August 8, 1846, after amendments to the fifth article, (which is given above as amended,) and striking out the twelfth article.   The amend-

ments to the treaty by the Senate were agreed to by the representatives of the several parties of Indians, August 13, 1846.

A joint resolution of Congress was approved August 7, 1848, 9 Stat. 339, as follows:

"That the proper accounting officers of the Treasury be, and they are hereby, authorized and required to make a just and fair statement of the claims of the Cherokee Nation of Indians, according to the principles established by the treaty of August, eighteen hundred and forty-six, between the United States and said Indians, and that they report the same to the next session of Congress."

On the 8th of August, 1850, the Senate Committee on Indian Affairs made a report, (Sen. Rep. 1st Sess. 31st Cong. No. 176,) setting forth, among other things, that "the statement of accounts according to the principles of the treaty of 1846 between the United States and the Western and Eastern Cherokees, respectively, was a labor of time and research, involving an examination of every item of expenditure under the treaty of 1835, through a period extending from the year 1835 to 1846. This duty was, therefore, committed by joint resolution of Congress of the 7th of August, 1848, to the Second Auditor and Second Comptroller of the Treasury; not only because they were 'the proper accounting officers,' but because one of those officers had acted as one of the commissioners of the United States in making the treaty of 1846, and was justly supposed to be well informed as to its true object and intent."

The officer thus referred to was Judge Parris, of Maine, and the record contains the report of the Second Comptroller and Second Auditor of the Treasury, giving a statement of the account of the Cherokee Nation of Indians, according to the principles established by the treaty. The items of charges against the Cherokee Nation are given in detail and deducted from $6,647,067, the amount specified in Article 9 of the treaty, being made up of the $5,000,000, the $600,000, and the $1,047,067.

The account as stated in the Senate report was as follows:

"This fund, provided by the treaty of 1835, consisted of.... $5,600,000 00
From which are to be deducted, under the treaty of 1846,
    (4th article,) the sums chargeable under the 15th arti-
    cle of the treaty of 1835, which, according to the report
    of the accounting officers, will stand thus:

| | | |
|---|---:|---:|
| For improvements | $1,540,572 27 | |
| For ferries | 159,572 12 | |
| For spoliations | 264,894 09 | |
| For removal and subsistence of 18,026 In-<br>dians, at $53.33⅓ per head | 961,386 66 | |

Debts and claims upon the Cherokee Nation,
    viz.:

| | | |
|---|---:|---:|
| National debts (10th article).... $18,062 06 | | |
| Claims of United States citizens<br>  (10th article) 61,073 49 | | |
| Cherokee committee (12th arti-<br>  cle) 22,212 76 | | |
| | 101,348 31 | |
| Amount allowed United States for addi-<br>tional quantity of land ceded | 500,000 00 | |
| Amount invested as a general fund of the<br>nation | 500,880 00 | |
|     Making in the aggregate the sum of | | 4,028,653 45 |

Which, being deducted from the treaty fund of $5,600,000,
  leaves the residuum, contemplated by the 4th article
  of the treaty of 1846, of............................ $1,571,346 55"

of which amount one-third was to be allowed to the Western
Cherokees for their interest in the Cherokee country east,
being the sum of $523,782.18, and an appropriation of that
amount was recommended. The committee also considered
the two questions referred to the Senate in respect of whether
the amount expended for subsistence should be borne by the
United States or by the Cherokee funds; and whether the
Cherokees should receive interest on the sums found due them
from a misapplication of their funds; and recommended the
adoption of the following resolutions, which were accordingly
adopted, September 5, 1850, by the Senate as umpire under
Article 11 of the treaty of 1846, (Sen. Journ. 1st Sess. 31st
Cong. 601):

"*Resolved by the Senate of the United States,* That the Cher-
okee Nation of Indians are entitled to the sum of $189,422.76
for subsistence, being the difference between the amount

allowed by the act of June 12, 1838, and the amount actually paid and expended by the United States, and which excess was improperly charged to the 'treaty fund' in the report of the accounting officer of the Treasury.

"*Resolved*, That it is the sense of the Senate that interest at the rate of five per cent per annum should be allowed upon the sums found due the 'Eastern' and 'Western' Cherokees, respectively, from the 12th day of June, 1838, until paid."

The committee gave their reasons for the first resolution at length. They stated that they entertained no doubt but that by a strict construction of the treaty of 1835 the expense of a year's subsistence of the Indians after their removal west was a proper charge upon the treaty fund, but they set forth a variety of considerations which justified the conclusion that the expense for subsistence was to be borne by the United States, including certain action by the Secretary of War in 1838, and the language of the act of June 12, 1838, making the appropriation of $1,047,067. By the latter Congress provided that no part of the $600,000 or of the $1,047,067 should be taken from the treaty fund. The $1,047,067 was, said the committee, "made auxiliary to the $600,000 provided for in the third supplemental article — a fund provided for removal and other expenditures independent of the treaty, and in full for these objects. But as respects *subsistence*, it was *in aid* of the *expense* for that purpose, a discharge *pro tanto* of the obligation of the government to subsist them, and not final satisfaction, as in the case of removal. The fund proved wholly inadequate for these purposes. The entire expense of removal and subsistence amounted to $2,952,196.26, of which the sum of $972,844.78 was expended for subsistence, and of this last amount, $172,316.47 was furnished to the Indians when in great destitution, upon their own urgent application, after the expiration of the one year, upon the understanding that it was to be deducted from the moneys due them under the treaty. This leaves the net sum of $800,528.31 paid for subsistence, and charged to the aggregate fund. Of this sum the United States provided, by the act of 12th of June, 1838,

for $611,105.55." This left $189,422.76 to be made up in order to cover the entire subsistence.

The second section of the act of June 12, 1838, read as follows:

" That the further sum of one million forty-seven thousand and sixty-seven dollars be appropriated, out of any money in the Treasury not otherwise appropriated, in full for all objects specified in the third article of the supplementary articles of the treaty of eighteen hundred and thirty-five between the United States and the Cherokee Indians, and for the further object of aiding in the subsistence of said Indians for one year after their removal west : *Provided*, That no part of the said sum of money shall be deducted from the five millions stipulated to be paid to the said tribe of Indians by said treaty."

And of this amount the committee found that only $611,105.55 had been expended for the one year's subsistence.

The act of Congress of September 30, 1850, making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30, 1851, 9 Stat. 544, 556, c. 91, contained the following :

" For the additional amount for expenses paid for subsistence and improperly charged to the treaty fund, according to the award of the Senate of fifth day of September; eighteen hundred and fifty, under the provisions of the eleventh article of the treaty of sixth day of August, eighteen hundred and forty-six, one hundred and eighty-nine thousand four hundred and twenty-two dollars and seventy-six cents, and that interest be paid on the same at the rate of five per cent per annum, according to a resolution of the Senate of fifth September, eighteen hundred and fifty : *Provided*, That said money shall be paid by the United States and received by the Indians on condition that the same shall be in full discharge of the amount thus improperly charged to said treaty fund : *Provided, further*, That in no case shall any money hereby appropriated be paid to any agent of said Indians, or to any other person or persons than the Indian or Indians to whom it is due *per capita.*

" To the ' Old Settlers,' or ' Western Cherokees,' in full of all demands, under the provisions of the treaty of sixth August, eighteen hundred and forty-six, according to the principles established in the fourth article thereof, five hundred and thirty-two thousand eight hundred and ninety-six dollars and ninety cents; and that interest be allowed and paid upon the above sums due, respectively, to the Cherokees and ' Old Settlers,' in pursuance of the above-mentioned award of the Senate, under the reference contained in the said eleventh article of the treaty of sixth August, eighteen hundred and forty-six: *Provided*, That in no case shall any money hereby appropriated be paid to any agent of said Indians, or to any other person or persons than the Indian or Indians to whom it is due: *Provided, also*, That the Indians who shall receive the said money shall first, respectively, sign a receipt or release, acknowledging the same to be in full of all demands under the fourth article of said treaty."

The Western Cherokees were accordingly paid *per capita* the amount so appropriated, principal and interest, the interest amounting to $345,583.25. They receipted as required by the statute, but upon the occasion of their being so paid they gave to the Superintendent of Indian Affairs, at Fort Gibson, a protest setting forth their reasons why the payment should not be received in full of all demands. The form of the receipt thus executed was as follows:

" We the undersigned ' Old Settlers,' or Western Cherokees, do hereby acknowledge to have received from John Drennen, supt. of Indian affairs, the sums opposite our names respectively, being in full of all demands under the provisions of the treaty of the sixth of August, eighteen hundred and forty-six, according to the principles established in the fourth article thereof, as per act entitled ' An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30th, one thousand eight hundred and fifty-one.' Approved September 30th, 1850."

The protest, after setting forth that the condition of the

Old. Settlers had been a deplorable one, and that they ought not to be deprived summarily of the right to present a claim for. a larger amount than had been awarded to them, and referring to the report of the Senate Committee on Indian Affairs, and the appropriation of the $189,422.76, and that the treaty fund should be relieved of the whole amount expended on account of subsistence as an improper charge, continued thus :

"4th. It has thus been conclusively shown that after the statement was made, under the report of the accounting officers of December 3d, 1849, and the 'Old Settlers' were charged with the removal and subsistence of 18,026 Indians, the Senate of the United States decided that the subsistence was improperly charged, and in a subsequent appropriation for the Eastern Cherokees, or 'emigrant party,' it has been refunded, and the sum of $189,422.76, which had been charged to the treaty fund, has been declared to be an. 'improper' charge, and payment thereof is assumed by the United States. The 'Old Settlers,' or Western Cherokees, are, therefore, entitled to one-third part of the money improperly charged for the subsistence of 18,026 Indians, at $33.33⅓ cents per head, which has been deducted from the amount due them in the act of appropriation made for their benefit September 30th, 1850.' There were some slight alterations made in the statement of accounts after the report of the committee was submitted, but they changed the amount very little, and are not worth noting.

"5th. The amount, then, due the 'Old Settlers,' or Western Cherokees, in accordance with the decision of the Senate,. is the one-third part of the charge made against them for the subsistence one year after removal of 18,026 Indians, which, at $33.33⅓ cents per head, amounts to the sum of $600,856.66, the one-third part of which is $200,285.33 (two hundred thousand two hundred and eighty-five dollars and thirty-three cents). This sum, with the interest from June 12, 1838, is now due to the 'Old Settlers' Cherokees, (in addition to the amount appropriated by the act of September 30, 1850,) in accordance with the principle established by the

Senate of the United States in the resolution adopted by that honorable body. Here, in one item alone, the 'Old-Settler' Cherokees are declared by an act of the United States government to be entitled, in addition to the amount they are now receiving, to upwards of three hundred and thirty thousand dollars ($330,000). It is known to the 'Old Settlers' that many honorable members of Congress were aware that this item could have been added to the appropriation of September 30, 1850, and that a favorable report thereon would have been made from the Office of Indian Affairs, but that those who represented the 'Old Settlers,' with other friends, deemed it advisable not to make the effort then to change the statement already made — it being at the close of the session, when the least delay or interference might have defeated the appropriation, even under the first statement."

The protest then concluded with objections to the number of Indians for whose removal charges had been made, and generally to the charges for improvements, ferries, depredations, and for debts and claims upon the Cherokee Nation East and other expenditures of similar character, as improperly made.

The United States acquired the reservation, improvements and property in Arkansas referred to in article for " of the treaty of 1828, but neither the agreement therein set forth on the part of the United States to account for and invest the proceeds thereof to the use of the Western Cherokees, nor the subsequent agreement set forth in the treaty of 1833, was ever performed. The tract of land so ceded to the United States contained 3343.41 acres, of the value of $4179.26.

Certain papers on file in the Interior Department were put in evidence, purporting to be copies of the proceedings of councils of the Western Cherokees held in the years 1875, 1876, 1877, 1879, 1880, 1881, 1882 and 1883, at Tahlequah, Cherokee Nation. At these councils, Bryan, Wilson and Hendricks were appointed commissioners to prosecute the claims of the Western Cherokees against the United States, and Bryan was appointed treasurer of a fund of thirty-five

per cent of the moneys that might be recovered against the United States, which sum was placed at the disposal of the commissioners for the prosecution of the claim. It does not appear that these councils were composed of persons who were ascertained to be Western Cherokees in the manner prescribed in the fifth article of the treaty of 1846, nor did it appear that subsequent to the treaty the Western Cherokees had any organization or corporate existence under the laws of the United States or of the Cherokee Nation. The proceedings of the council held on October 25, 1883, embodied a number of resolutions, which, in the view taken of the case, it is unnecessary should be repeated.

The record does not show that the Western Cherokees formally denied the validity of the treaty of 1835 until the immigration of the Eastern Cherokees was completed, and until after there was a disagreement as to the government that should be adopted and control the Cherokee country. The earlier immigrants, known as the Ridge party, and the great body of the Eastern Cherokees, known as the Ross party, were welcome to the country as immigrants under the existing laws. Prior to 1842 it does not appear that the Western Cherokees notified the United States that they had repudiated the action of Rogers and Smith, who signed the treaty of 1835 as delegates from the Western Cherokees. After the entry of the Eastern Cherokees, the question first at issue between them and the Western Cherokees related to the government of the country, until, in 1842, they addressed a memorial to the President, setting forth their title to fourteen million acres of land and their right to the full and exclusive enjoyment of the same, of which they alleged they had been deprived by the intrusion of the Eastern Cherokees under the authority of the United States.

No action on behalf of the Old Settlers appears to have been taken from the filing of the protest September 22, 1851, until the year 1875; and in the meetings of the Old Settlers, heretofore referred to, the validity of the several treaties with the Cherokees was recognized.

On August 7, 1882, an act of Congress was approved, mak-

ing appropriations for sundry civil expenses, which contained the following clause:

, "The Secretary of the Interior shall investigate and report to Congress what in his opinion would be an equitable settlement of all matters of dispute between the Eastern Band of Cherokee Indians (including all the Cherokees residing east of the Mississippi River) and the Cherokee tribe or nation west; also all matters of dispute between other bands or parts of the Cherokee Nation; also all matters between any of said bands, or parts thereof, and the United States arising from or growing out of treaty stipulations or the laws of Congress relating thereto; and what sum or sums of money, if any, should, in his opinion, be paid under such settlement." 22 Stat. c. 433, pp. 302, 328.

In pursuance of the authority thus given, an investigation was directed and a report made by the Secretary of the Interior, February 23, 1883, contained in Senate Documents, Second Session, Forty-seventh Congress, Executive Document, No. 60. This is the claim referred to in the jurisdictional act, and shows a balance of $421,653.68, in accordance with the following account:

*"Account with the whole Cherokee people.*

| | DR. | CR. |
|---|---|---|
| "By amount appropriated by act of July 2, 1836, for lands under first article treaty of 1835 | | $5,000,000 00 |
| By amount appropriated under third article treaty 1836, by act of July 2, 1836 | | 600,000 00 |
| By amount erroneously charged for removal of 2495 [should be 18,026] Indians, at $53.33⅓ per head | | 961,386 66 |
| To amount paid for improvements | $1,540,572 27 | |
| To amount paid for ferries | 159,572 12 | |
| To amount paid for spoliations | 264,894 09 | |
| To removal and subsistence of 18,026 Indians at $53.33⅓ per head | 961,386 66 | |
| To debts, &c. | 101,348 31 | |
| To additional land purchased | 500,000 00 | |
| To amount invested as a permanent fund | 500,880 00 | |
| | $4,028,653 45 | $6,561,386 66 |
| Deduct | | 4,028,653 45 |
| Balance due as of date June 12, 1838 | | $2,532,733 21 |

Statement of the Case.

|  | DR. | CR. |
|---|---|---|
| Balance due as of date June 12, 1838 ..................... | | $2,532,733 21 |
| Of which amount the 'Old Settlers' are entitled to one-third ............................................. | | 844,244 40 |
| 'Old Settlers' account.................................. | | $844,244 40 |
| To one-third of unexpended balance of $600,000 appropriated under article 3, treaty 1836, viz., $39,300 ................................................ | $13,100 00 | |
| To one-third of the cost of removing 2495 Indians, at $53.33 per head, $133,058.35 ..... | 44,352 78 | |
| | $57,452 78 | $844,244 40 |
| Deduct ............................................. | | 57,452 78 |
| Balance due........................................ | | $786,791 62 |
| By interest on balance ($786,791.62), at 5 per cent, from June 12, 1838, to September 22, 1851 ...................................... | | $522,342 21 |
| To appropriation by act September 22, 1851.... | 532,896 90 | |
| To interest allowed under same act ........... | 354,583 25 | |
| | $887,480 15 | $1,309,133 83 |
| Deduct...................................... | | 887,480 15 |
| Balance due 'Old Settlers' ......................... | | $421,653 68" |

The principal difference between this and the prior account was in the deduction of the item of $961,386.66.

The Secretary's report was accompanied by that of the Commissioner of Indian Affairs, going over the whole subject of the claims of the Eastern and of the Western Cherokees, with accompanying reports, and among others, two of the Senate Committee on Indian Affairs, one made February 9, 1881, and another March 29, 1882, the latter being a repetition of the former. These reports considered the claim of the Western Cherokees and announced the conclusion that the receipt by those Indians, under the act of September 30, 1850, "does not preclude them from making their claim for any other sum that may be justly due them under a fair and proper interpretation of the treaties with them," and that the facts necessary to determine the justness of the claim preferred by them "consist almost, if not wholly, of public treaties, proceedings of the Senate, acts of Congress, and the records of the several departments of the government, all of which are preserved." The committee were of opinion that the

case should receive a full investigation by the courts, because such an investigation involved a judicial interpretation of the several treaties, the construction of the several acts of Congress and the examination of the settlements made and accounts stated with them, under these treaties and acts of Congress.

On February 13, 1884, the case of the Old Settlers was transmitted to the Court of Claims by the Senate Committee on Indian Affairs, under the provisions of the act of March 3, 186 . Findings of fact were made by the court and transmitted to Congress, February 9, 1885. These findings found the charges against the treaty fund to be the same as fixed in the report of August 8, 1850, and the report of 1883, except as to the number of Eastern Cherokees whose removal was properly chargeable to said fund, the number being fixed at 17,252 instead of 18,026. After making the deductions, except as to removal and subsistence, the balance of the treaty fund was found to be as according to the report of the Secretary of the Interior, $2,532,733.21, but if it should be determined that the cost of removing that portion of the Eastern Cherokees, who were removed in pursuance of the appropriation of $1,047,067, made by the act of 1838, should not be charged, then this balance should be reduced only by the cost of removing 2495 Eastern Cherokees, who were removed prior to the act, at $53.33 *per capita*, or $133,058.35. If, on the other hand, it should be determined that the Western Cherokees were properly chargeable with those removed subsequent to the act of June, 1838, as well as before, namely, for 17,252 Cherokees, then the amount of $920,049.16 should be deducted. The account would then stand:

'Treaty fund .......................................... $2,532,733 21
Deduct for removal of 2495-Eastern Cherokees removed
    prior to act of June 12, 1838........................... 133,058 35

    Residuum to be divided.............................. $2,399,674 86

One-third thereof awarded to Western Cherokees........... $799,891 62
Less the payment of..................................... 532,896 90

    Balance ............................................ $266,994 72"

Or,

| " Treaty fund | $2,532,733 21 |
|---|---|
| Deduct for removal and subsistence of 17,252 Eastern Cherokees at $53.33 *per capita* | 920,049 16 |
| Residuum to be divided | $1,612,684 05 |
| One-third thereof awarded to Western Cherokees | $537,561 35 |
| Less the payment of | 532,896 90 |
| Balance | $4,664 45" |

No action was taken by Congress on these findings of the Court of Claims. On February 25, 1889, the act upon which this suit is founded was approved by the President. 25 Stat. 694.

The case having come on for hearing in the Court of Claims, and been duly argued and-submitted, an elaborate opinion was delivered by Nott, J., November 30, 1891, and on January 25, 1892, findings of fact and conclusions of law were filed by that court. On that day a second opinion by Nott, J., was given, the case having been reopened so far as to hear counsel and admit documentary evidence relating to the number of the Eastern Cherokees, who were removed under the treaty of 1835, and also to hear counsel with regard to the form of the decree. 27 Ct. Cl. 1, 20, 56.

The account stated by the Court of Claims is as follows:

| " The treaty fund | | $5,600,000 00 |
|---|---|---|
| Less for 800,000 acres of land | $500,000 00 | |
| For investment in the general land fund | 500,000 00 | |
| For improvements of individual Cherokees | 1,540,572 27 | |
| For ferries belonging to individuals | 159,572 12 | |
| For spoliations of individual property | 264,894 09 | |
| For expenses of Cherokee committee | 22,212 76 | |
| For removal of 16,957 Cherokees, at $20 each | 339,140 00 | |
| | | 3,326,391 24 |
| Giving as the true residuum to be divided | | $2,273,608 76 |
| Due to the Western Cherokees, one-third of residuum | | $757,869 58 |
| Less payment September 22, 1851, under the act of September 30, 1850 | | 532,896 90 |
| Leaving as the balance due the Western Cherokees | | $224,972 68" |

The differences between this account and that of August 8, 1850, and February 3, 1883, are, that the investment of the permanent land fund was found to be $500,000 instead of $500,880; the $101,348.31 for debts and claims upon the Cherokee Nation allowed in the two previous reports, and the former findings of the Court of Claims, was reduced to $22,212.76 by rejecting therefrom the items of national debt, $18,062.06, and claims of United States citizens, $61,073.49. An allowance for the removal of 16,957 Cherokees at $20 each, aggregating $339,140, was made, stead of for the removal and subsistence of 18,026 Indians at $53.33⅓ *per capita*, $961,386.66, as in the report of August 8, 1850, or the cost of removal and subsistence of 2495 Indians, at $53.33 *per capita*, $133,058.35, as shown by the report of February 3, 1883, and by the previous findings in this regard of the Court of Claims. There was added also the value of the agency reservation appropriated by the United States under the treaties of 1828 and 1833, being $4179.26. The Court of Claims also found as a conclusion of law that interest at the rate of five per cent should be allowed on the balance of the residuum of the treaty fund still due to the Western Cherokees from June 12, 1838, to the entry of judgment, but not upon the amount of $4179.26, the value of the land last mentioned. It was also found as a conclusion of law that the receipts given by individual Cherokees did not preclude them from recovering their just appropriation of the *per capita* fund within the intent of the act of February, 1889, referring their claims to the court.

The court also made the following ruling :

" The findings requested by the claimants to establish the alleged facts that the treaty of 1846 was procured as against the Western Cherokees by duress and fraud have been excluded from consideration by the court, on the ground that it has not jurisdiction of such a cause of action."

Decree was entered as follows :

" It is ordered and adjudged that the claimants recover of the defendants the sum of ($224,972.68) two hundred and twenty-four thousand nine hundred and seventy-two dollars and sixty-eight cents, being a balance of the *per capita* fund

provided by the fourth article of the treaty between the United States and the Western Cherokees, dated August 6, 1846, together with interest thereon from the 12th day of June, 1838, up to and until the entry of this decree, being the sum of $603,145.58, and likewise the sum of $4179.26 for 3343$\frac{41}{100}$ acres of land in Arkansas ceded to the United States by article 4 of the treaty of May 6, 1828, amounting in the aggregate to the sum of $832,297.52. And it is at the same time ordered and adjudged that the said amount of eight hundred and thirty-two thousand two hundred and ninety-seven dollars and fifty-two cents so recovered by the claimants be held in trust by the government of the United States and be paid by the proper agent of the United States to each individual of the claimants entitled to participate in the said *per capita* fund, pursuant to and in the manner provided and required by the fifth article of the said treaty of August 6, 1846."

From this decree both parties prayed an appeal to this court.

Subsequently the claimants moved that in preparing the record for transmission, the Clerk of the Court of Claims be instructed to include in the transcript "all of the pleading, orders, evidence, findings of fact, opinions of the court, conclusions of law, and decree, as the same appear of record." This motion was overruled. Application was thereupon made to this court for a writ of *certiorari* to the Court of Claims to send up all of the evidence used in the trial and hearing of the case. The writ was granted and the evidence sent up accordingly.

*Mr. Reese H. Voorhees* and *Mr. A. H. Garland*, (with whom was *Mr. John Paul Jones* on the brief,) for the Old Settlers.

*Mr. Solicitor General* and *Mr. F. P. Dewees* for the United States.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

In *Harvey* v. *United States*, 105 U. S. 671, 691, a claim had been considered by the Court of Claims and judgment rendered for a certain amount, but less than would have been awarded, but for certain terms of the contract counted on, which required reformation, on the ground of accident or mistake, in order fully to express the intention of the parties; and a special act was passed again referring the claim for adjudication, and stating: " To that end jurisdiction is hereby conferred on said court to proceed in the adjustment of the account between said claimants and the United States, as a court of equity jurisdiction; and may, if according to the rules and principles of equity jurisprudence, in its judicial discretion, reform said contract and render such judgment as justice and right between the claimants and the said government may require."

On appeal to this court from a decree rendered under this act, it was contended on the part of the United States that the appeal could not be heard, because there was not in the record " any finding by the Court of Claims of the facts in the case, in the nature of a special verdict, with a separate statement of the conclusions of law upon such facts." But this court held, through Mr. Justice Blatchford, that: " The rule in regard to findings of fact has no reference to a case like the present, of equity jurisdiction conferred in a special case by a special act; and, in such a case, where an appeal lies and is taken under section 707 of the Revised Statutes, this court must review the facts and the law as in other cases in equity, appealed from other courts."

In the present case the Court of Claims filed findings of fact and conclusions of law, and declined to send up the evidence. We are of opinion, however, that the rule laid down in *Harvey* v. *United States* is applicable. The claim was referred for adjudication, and jurisdiction was conferred on the Court of Claims to determine the amount, if any, justly due from the United States to the Western Cherokees, in a manner involving the statement of an account, upon the investigation of controverted items and complicated and involved facts, and it was declared that it was " the intention of this act to allow

the said Court of Claims unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of the said Indians, may be fully considered and determined."

We concur in the statement of Mr. Justice Nott in the opinion of the court below, that the latitude conferred "must be deemed the unrestricted latitude of a court of equity in stating an account, distributing a fund, and framing a decree, so comprehensive and flexible as to secure to each suitor his joint or individual rights."

The remedy in equity in cases of account is generally more complete and adequate than it is or can be at law, 1 Story Eq. Jur. § 450; *Kilbourn* v. *Sunderland*, 130 U. S. 505, and we regard the language of the act of Congress as manifestly used with the intention that equity powers should be exercised in the disposition of the case. It was upon this view that we directed the *certiorari* to issue, and in arriving at our conclusions, while we have had the advantage of the findings of the Court of Claims, we have considered and determined the case for ourselves upon an examination of the entire evidence.

The prayer of the petitioners is in the alternative: First, that they be relieved from the provisions of the treaty of 1846 on the ground of duress and fraud, and that the United States be decreed and adjudged to pay them the value of two-thirds of 13,610,795.24 acres of land at sixty-two and one-half cents per acre, being the sum of $5,671,164.72½, together with the sum of $30,000 for property destroyed, and $9179.63¼ for the agency reservation and improvements in Arkansas, less one-third of the amount of $500,000 for additional lands and of $500,000 permanently invested, and the payment in 1851 of $532,896.90, leaving a balance of $4,844,113.65, with interest at the rate of five per cent per annum from June 12, 1838, until paid; second, that, if petitioners be not entitled to that relief, the United States be decreed to pay them the sum of $330,756.94, under the provisions of the fourth article of the treaty of 1846, together with the before-mentioned sums of $9179.16¼ and of $30,000, aggregating the amount of $369,936.10¼, with interest as aforesaid.

The Court of Claims declined to go behind the treaty of 1846 upon the ground that it was not within the province of a court, either of law or equity, to determine that a treaty or an act of Congress had been procured by duress or fraud, and declare it inoperative for that reason. *Fletcher v. Peck*, 6 Cranch, 87, 130; *Ex parte McCardle*, 7 Wall. 506, 514; *People v. Draper*, 15 N. Y. 545, 555; *Railroad Company v. Cooper*, 33 Penn. St. 278; *Wright v. Defrees*, 8 Indiana, 302.

And while it was conceded that Congress might confer upon that court extra-judicial powers, yet the court was of opinion that this could not be held to have been done by the act authorizing the institution of this suit, since it was therein provided that whatever judgment might be rendered, whether for the complainants or defendants, might be appealed to the Supreme Court, whose jurisdiction, as defined by the Constitution, was strictly judicial, and could neither be enlarged nor diminished by legislative authority. *Gordon v. United States*, 2 Wall. 561; Taney, C. J., 117 U. S. 697, Appx.; *In re Sanborn, ante* 222.

The contention of the petitioners is that, under the act of jurisdiction, the treaty of 1846 is to be considered as a contract in every respect similar to one made between private parties, and that the United States has no other or greater privileges or advantages than a private party would have under a similar contract, and *United States v. Arredondo*, 6 Pet. 691, 710, 711, 735, is cited. That was a suit for land claimed under a Spanish grant, and came to this court on appeal from the decree of the judge of the Superior Court for the Western District of the Territory of Florida, that court having been authorized by the act of Congress of May 23, 1828, to receive and adjudicate upon such claims, upon the petition of the claimant, "according to the forms, rules and regulations, conditions, restrictions and limitations prescribed to the district judge, and claimants in Missouri, by the act of the 26th May, 1824."

Reviewing the two statutes, this court said: "In conformity with the principles of justice and rules of equity, then, the court is directed to decide all questions arising in the cause,

and by a final decree to settle and determine the question of the validity of the title, according to the law of nations, the stipulations of any treaty and proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it is alleged to be derived, and all other questions which may properly arise between the claimants and the United States, which decree shall, in all cases, refer to the treaty, law or ordinance under which it is confirmed or decreed against. . . . By the stipulations of a treaty are to be understood its language and apparent intention manifested in the instrument, with a reference to the contracting parties, the subject-matter, and persons on whom it is to operate. The laws under which we now adjudicate on the rights embraced in the treaty, and its instructions, authorize and direct us to do it judicially, and give its judicial meaning and interpretation as a contract on the principles of justice and the rules of equity. . . . The only question depending is whether the claimants or the United States are the owners of the land in question. By consenting to be sued, and submitting the decision to judicial action, they have considered it as a purely judicial question, which we are now bound to decide as between man and man, on the same subject-matter and by the rules which Congress themselves have prescribed, of which the stipulations of any treaty and the proceedings under the same, form one of four distinct ones. . . . But the court are, in this case, authorized to consider and construe the treaty, not as a contract between two nations, the stipulations of which must be executed by an act of Congress before it can become a rule for our decision, not as the basis and only foundation of the title of the claimants; but as a rule to which we must have a due regard in deciding whether the claimants have made out a title to the lands in controversy, — a rule by which we are neither directed by the law nor bound to make our decree upon, any more than upon the laws of nations, of Congress, or of Spain. The acts of 1824 and 1828 authorize and require us to decide on the pending title on all the evidence and laws before us. Congress have disclaimed its decision as a political

question for the legislative department to decide, and enjoined it on us as one purely judicial."

It will be perceived that that decision is not authority for the proposition that a court may be clothed with power to annul a treaty on the ground of fraud or duress in its execution, nor does any such question arise in the case before us. There is nothing in the jurisdictional act of February 25, 1889, inconsistent with the treaty of 1846, (or any other,) and nothing to indicate that Congress attempted by that act to authorize the courts to proceed in disregard thereof. Unquestionably a treaty may be modified or abrogated by an act of Congress, but the power to make and unmake is essentially political and not judicial, and the presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its own action or the action of the government to judicial decision, by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference.

The claim referred to the Court of Claims for adjudication is the claim set forth in the report of the Secretary of the Interior to Congress of February 3, 1883, and that report was made under the act of Congress of August 7, 1882, which provided that the Secretary should investigate and report to Congress what in his opinion would be an equitable settlement of the matters in dispute between these Indians and the United States, " arising from or growing out of treaty stipulations, or the laws of Congress relating thereto; and what sum or sums of money, if any, should in his opinion be paid under such settlement." The same language is used in the act, and the court is " to determine what sum or sums of money, if any, are justly due from the United States to said Indians arising from or growing out of treaty stipulations and acts of Congress relating thereto."

As a case arises under the Constitution or laws of the United States, whenever its decision depends upon the correct construction of either, *Cohens* v. *Virginia*, 6 Wheat. 264, 379; *Osborn* v. *Bank of the United States*, 9 Wheat. 737, 824, so a

case arising from or growing out of a treaty is one involving rights given or protected by a treaty. *Owings* v. *Norwood's Lessee*, 5 Cranch, 344, 348.

The settlement of a controversy arising or growing out of these Indian treaties or the laws of Congress relating thereto, and the determination of what sum, if any, might be justly due under them, certainly does not include a claim which could only be asserted by disregarding the treaties or laws, or holding them inoperative on the ground alleged.

The Court of Claims was indeed to have " unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of the said Indians may be fully considered and determined." But this did not mean that either party was entitled to have or receive by virtue of the act anything more than each was entitled to under existing stipulations, or to bring supposed moral obligations into play for the disposal of the case. The inquiry was not to be technically limited by rules of procedure, or restrained by the distinctions between law and equity. Proceeding thus untrammelled, the court was to deduct " all offsets, counter-claims, and deductions of any and every kind and character which should be allowed to the United States under any valid provision or provisions in said treaties and laws contained, or to which the United States may be otherwise entitled." And, therefore, if conflict existed between treaty provisions, or between any of them and subsequent acts of Congress, such provisions might necessarily give way and be held invalid ; but the language used did not involve a confusion of the respective powers of the departments of the government, nor furnish a basis for an external attack upon the validity of executive or legislative action.

Again, the determination of what, if anything, was justly due, was to be arrived at upon a full consideration of " whether or not the said Indians have heretofore adjusted and settled their said claim with the United States." That claim was the claim referred to the court, the claim which was reported upon by the Secretary, the claim which arose and grew out of treaty stipulations, the claim which was preferred in the pro-

test of 1851, and not a claim for the loss of two-thirds of seven million acres of land and of exclusive rights in the outlet. There had been such a claim as the latter, but it had been definitively relinquished and released by the treaty.

The terms of the treaty of 1828, by which the seven million acres were guaranteed to the Cherokees, while the Western Cherokees were alone being dealt with, expressed that the purpose was to provide a home for the whole Cherokee people, including those East as well as those West. By article two of the treaty of 1835, the conveyance of land by the treaties of 1828 and 1833 is declared to have been to the Cherokee Nation of Indians, and eight hundred thousand acres additional was agreed to be conveyed in consideration of the sum of $500,000, that there might be no question as to there being a sufficient quantity of land for the accommodation of the whole nation on their removal West. That treaty was wholly inconsistent with the attitude subsequently assumed. The patent of December 31, 1838, ran to the Cherokee Nation. There are many documents in the record indicative of the view of the Indian Office that the Western Cherokees were only a contingently separate community from the Eastern body, and were subject to increase by the immigration of those East; and that they did not have, as an independent community, any ownership of the land, or rights therein, except what belonged to them in common with the whole Cherokee people. At the same time, the Western Cherokees did set up the opposite contention, and prosecuted it with the greatest vigor and ability before the political departments of the government, especially during the years 1842 to 1846. Indeed, prior to 1842, they seem to have acquiesced in the treaty of 1835, and welcomed not only the treaty party, but the great body of the Eastern Cherokees, to participation with them under existing laws. The papers presented in their behalf show, as stated by counsel, the most careful preparation and noticeable ability. In a memorial bearing date June 16, 1843, their alleged grievances were set forth *in extenso*, and it was insisted that by the forcible removal of the Eastern Cherokee Indians and their settlement among them, the Western Cherokees had

been in effect dispossessed of two-thirds of their land. But in June, 1846, the Western Cherokees offered to submit their claims to a board of commissioners, to be appointed by the President and Senate of the United States, which commission it was stipulated should be invested with full power to settle the matters in controversy, according to the treaty stipulations. The commission was appointed, and its decision was against the claim of the Western Cherokees to the exclusive owner-ship of and rights in the land in question. On the 3d of August, 1846, the delegates representing the Western Chero-kees declared that they did not acquiesce in the decision of the commissioners on this point, and should reassert "their exclusive right to the country," "should the treaty now pro-posed fail from any cause"; but the treaty did not fail, and, on the contrary, was duly executed by the parties on the 6th day of the same month. And this was followed by the accounting under the treaty, the act of Congress of Septem-ber, 1850, and the payments made and receipted for there-under. True, there was a protest that the receipts then given ought not to exclude these Indians from obtaining a further amount, but that protest was chiefly based upon the deduction of the cost of subsistence from the treaty fund, and asserted no claim on account of the land, nor the invalidity of the treaty. Moreover, they remained silent, so far as appears from this record, from 1846 until 1875, and when they commenced the agitation of renewed demands the grounds assigned conceded the binding force of the treaty, but questioned the payment under it as a final settlement of what was due.

Upon the facts in this record we can discover no ground for the revival of controversy by the Western Cherokees as to their ownership of or rights in the lands west of the Mississippi, and hold that any such claim in respect thereof as is put forward in the petition cannot be successfully main-tained from any point of view. If any matter ever can be put at rest, that has been, and the treaty of 1846 has presented for nearly fifty years an insuperable bar to such a contention.

The treaty declared "that the land now occupied by the Cherokee Nation shall be secured to the whole Cherokee

people for their common use and benefit"; and that whereas it had been decided by the board of commissioners appointed to examine and adjust the claims and difficulties existing against and between the Cherokee people and the United States, as well as between the Cherokees themselves, that under the provisions of the treaty of 1828 the Western Cherokees "had no exclusive title to the territory ceded in that treaty, but that the same was intended for the use of, and to be the home for, the whole nation, including as well that portion then east as that portion then west of the Mississippi"; and that the Western Cherokees had a claim upon the United States, growing out of the equitable operation of the same treaty, as having a common interest in the lands occupied by the Cherokees east of the Mississippi River, as well as having retained a common interest "in the general funds of the nation," the ascertainment of "the value of that interest" was provided for, and the government agreed to distribute it among the Western Cherokees.

In consideration of the premises, the Western Cherokees released and quitclaimed to the United States all right, title, interest or claim they might have to a common property in the Cherokee lands east of the Mississippi River, and to exclusive ownership to the lands west of the Mississippi, including the outlet west, "consenting and agreeing that the said lands, together with the eight hundred thousand acres ceded to the Cherokees by the treaty of 1835, shall be and remain the common property of the whole Cherokee people, themselves included."

In order to arrive at the amount to be distributed *per capita* to the Western Cherokees, or Old Settlers, it was agreed that from the $5,600,000, the investments and expenditures properly chargeable thereon, and enumerated in the fifteenth article of the treaty of 1835, excluding all extravagant and improper expenditures, should be deducted, and that one-third of the residuum should constitute the value of their interest, and, consequently, the amount for distribution. An accounting was had accordingly, and the amount ascertained appropriated and paid over.

But it is argued that the object of the suit before us was to permit a relitigation of the correctness of that amount, and a determination as to whether anything more should have been paid at that time. And we are confronted by the objection, strongly urged on behalf of the United States, that, by the terms of the jurisdictional act, if it be found that "the said Indians have heretofore adjusted and settled their said claim with the United States," such adjustment and settlement must be treated as conclusive.

We agree, as was said in the case of *Choctaw Nation*, 119 U. S. 1, 29, that where, in professed pursuance of treaties, statutes have conferred valuable benefits upon the Indians, "which the latter have accepted, they partake of the nature of agreements — the acceptance of the benefit, coupled with the condition, implying an assent on the part of the recipient to the condition, unless that implication is rebutted by other and sufficient circumstances." And it is also true that when a party, without force or intimidation, and with a full knowledge of all the facts in the case, accepts, on account of an unliquidated and controverted demand, a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction, he will not be permitted to avoid his act on the ground of duress. *United States* v. *Child*, 12 Wall. 232, 244.

But we think, under all the circumstances disclosed here, that Congress being convinced that a mistake had probably been made in the accounting in a matter which the Indians from the first had called attention to, and desirous, as being the stronger party to the controversy, that that superior justice, which looks only to the substance of the right, should be done in the premises, voluntarily waived any reliance upon lapse of time or laches, and, after attempts on its own part to arrive at a satisfactory result, determined to obtain a judicial interpretation of the treaties and laws bearing upon the subject, and to be bound by judicial decision in respect of the conclusions flowing therefrom, and arrived at upon equitable principles; and that the jurisdictional act passed in effectuation of such intention left it open to the courts to

readjust the amount notwithstanding the claim might have been theretofore settled. In other words, if the adjustment and settlement were found to have been made upon an erroneous interpretation, which led to an obvious mistake, then Congress designed that the mistake should be corrected. We therefore proceed to examine the account in question in accordance with what we believe to have been the intention of Congress in the passage of this act.

As we have said, the investments and expenditures which were properly chargeable upon the $5,600,000 were to be deducted, and they were the investments and expenditures particularly enumerated in the fifteenth article of the treaty of 1835. That article provided for the deduction of the amounts "actually expended for the payment for improvements, ferries, claims for spoliations, removal, subsistence, and debts and claims upon the Cherokee Nation, and for an additional quantity of land, and goods for the poorer class of Cherokees, and the several sums to be invested for the general national funds provided 'for in the several articles of this treaty." The national fund of $500,000 embraced the items last mentioned, and no dispute arises here as to that sum or the sums of $500,000 for the additional quantity of land, $1,540,572.27 for improvements, $159,572.12 for ferries, and $264,894.09 for spoliations. Petitioners claim, however, that no deduction should have been made for subsistence, and that the sum allowed for removal should be limited to 2200 Indians at $20 per head; and they further insist upon an allowance of $30,000 for property destroyed, while they abandon their claim for $9179.16¼ as the value of the Arkansas agency land and improvements, and concede that the sum of $4179.26 therefor, as found by the court below, may be accepted as correct. The Court of Claims disallowed the item of $30,000, and charged for the removal of 16,957 Cherokees at $20 each, and an item for the expenses of the Cherokee committee of $22,212.76.

We concur in the rejection of the claim for $30,000, which finds its basis in a resolution of a council of the Western Cherokees of November 16, 1846, asking the government to

appropriate that sum to pay off damages and losses alleged to have been sustained by individual Indians in being compelled to leave their homes and go to the States for safety. No such claimants appear or are represented here, and the claim has no relation to *per capita* distribution. There is no color for its revival in this proceeding.

It was agreed by article four of the treaty of 1846 that, so far as the Western Cherokees were concerned, in estimating the expenses of removal and subsistence of an Eastern Cherokee to be charged to the aggregate fund, the sums for removal and subsistence stipulated in the eighth article of the treaty of 1835 as commutation money should be adopted. That commutation was placed in the eighth article at $20 *per capita* for removal and $33.33 for subsistence. The persons composing the treaty party voluntarily emigrated to the Indian Territory prior to 1838 to the number of 2200, and they took with them 295 slaves of African descent. The Court of Claims properly considered that the expenses to be deducted could only apply to Cherokees, and, therefore, that the slaves could not be included in making the deduction as between the Western Cherokees and the United States, but to the 2200 the court added the 14,757 Eastern Cherokees, who were removed in 1838, and, rejecting any deduction for subsistence, charged the commutation price of $20 for 16,957 persons. We are satisfied from a careful examination of the evidence that the number was determined with all the accuracy possible, and should not be disturbed. And in view of the decision of the Senate by the adoption, September 5, 1850, of the first resolution, reported August 8, 1850, it is obvious that the expense of subsistence should not have been and would not be deducted.

The fourth article of the treaty of 1846 fixed a commutation for subsistence as well as for removal, but the eleventh article provided that whereas the Cherokee delegates contended that the amount expended for one year's subsistence was not properly chargeable to the treaty fund, it was thereby agreed that that question should be submitted to the Senate for its decision, which should decide whether the expense

should be borne by the United States or the Cherokee funds, and the Senate, thus made the umpire, (it having been found that the $1,047,067 appropriated by the act of June 12, 1838, did not fully cover the expense of subsistence,) resolved that the Indians were entitled to $189,422.76 for subsistence, "being the difference between the amount allowed by the act of June 12, 1838, and the amount actually paid and expended by the United States, and which excess was improperly charged to the treaty fund in the report of the accounting officers of the Treasury." This decision was accepted and the money appropriated to make good the award. The act of 1838 grew out of the inducements offered in promotion of the removal of the entire body, and made the appropriation in discharge of an assumed obligation to subsist the Indians, if they would remove, notwithstanding the involuntary character of that removal. Taking the acts of 1838 and 1850, with the decision of the Senate, there can be no question that the United States concluded to bear and did bear the entire expense so far as subsistence was concerned. The Court of Claims, therefore, correctly deducted the sum of $339,140 for the removal of the whole number of Cherokees at $20 per head, and declined to deduct any charge for subsistence. It was really over this item that the sharpest controversy ensued; for by the original accounting the sum of $961,383.66 had been deducted for the removal and subsistence of 18,026 Cherokees, at $53.33⅓ per head, which was erroneous as to the number, and on account of the inclusion of the commutation of $33.33⅓ for subsistence.

In the account stated by the accounting officers of the Treasury, December 3, 1849, the sum of $101,348.31 was deducted from the fund for debts and claims upon the Cherokee Nation, made up of these items: For national debts, $18,062.06; for claims of United States citizens, $61,073.49, and for the Cherokee committee, $22,212.76. This sum of $101,348.31 was also deducted in the account stated in the report of the Senate committee of August 8, 1850, in the report of the Secretary of the Interior of February 23, 1883, and in the findings of the Court of Claims under the reference in February, 1884.

The Court of Claims in this suit rejected the items of $18,062.06 and $61,073.49, because, in the opinion of the court, there was no evidence to connect these items with the fund for distribution, while it held the item of $22,212.76 for the expenses of the Cherokee committee as properly chargeable under the twelfth article of the treaty of 1835, which provided for a committee to carry the treaty into effect. We are not persuaded that this conclusion was correct. Under the tenth article of the treaty of 1835, the United States agreed to pay the just debts and claims against the Cherokee Nation held by citizens of the same, and also the just claims of citizens of the United States for services rendered to the nation, and it was stated that "the sum of sixty thousand dollars is appropriated for this purpose." This should be regarded as $60,000 of the total amount, and in our judgment the debts and claims upon the Cherokee Nation mentioned in article fifteen, and to be deducted under article four of the treaty of 1846, should be confined, so far as the Western Cherokees are concerned, to $60,000, and that amount is justly chargeable against the fund; but we are not satisfied that the expenses of the committee authorized by the twelfth article of the treaty of 1835, which was a committee to recommend persons for the privilege of preëmption rights and to select missionaries, as well, indeed, as to transact all business which might arise in carrying into effect the provisions of the treaty, ought to be charged in addition.

In view of these considerations we find and state the account as follows:

| | | |
|---|---:|---:|
| The treaty fund.......................................... | | $5,600,000 00 |
|     Less— | | |
| For 800,000 acres of land...................... | $500,000 00 | |
| For general fund................................ | 500,000 00 | |
| For improvements.............................. | 1,540,572 27 | |
| For ferries ................................... | 159,572 12 | |
| For spoliations................................ | 264,894 09 | |
| For debts, &c................................... | 60,000 00 | |
| For removal of 16,957 Cherokees at $20 each.. | 339,140 00 | |
| | $3,364,178 48 | 3,364,178 48 |
|     Giving as the residuum to be divided ............... | | $2,235,821 52 |

| | |
|---|---|
| One-third due to the Western Cherokees .................... | $745,273 84 |
| Less payment September 22, 1851 ........................... | 532,896 90 |
| Leaving a balance of ................................ | $212,376 94 |

And the recovery should also include the sum of $4179.26 for the Arkansas agency.

By the second resolution adopted by the Senate, as umpire, September 5, 1850, it was decided that interest should be allowed, at the rate of five per centum per annum, upon the sum found due the Western Cherokees, from June 12, 1838, until paid. As before stated, our conclusion is that the sum then found due was less than should have been found by the amount of $212,376.94.

Under section 1091 of the Revised Statutes, no interest can "be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest"; and in *Tillson* v. *United States*, 100 U. S. 43, it was held that a recovery of interest was not authorized under a private act referring to the Court of Claims a claim founded upon a contract with the United States, which did not expressly authorize such recovery. But in this case, the demand of interest formed a subject of difference while the negotiations were being carried on, the determination of which was provided for in the treaty itself; that determination was arrived at as prescribed, was accepted as valid and binding by the United States, and was carried into effect by the payment of $532,896.90, found due, and of $354,583.25 for interest. 9 Stat. 556, c. 91.

In view of the terms of the jurisdictional act and the conclusion reached in reference to the amount due, it appears to us that the decision of the Senate in respect of interest is controlling, and that, therefore, interest must be allowed from June 12, 1838, upon the balance we have heretofore indicated, but not upon the item of $4179.26, which stands upon different ground.

The question remains as to the character in which petitioners come into court and to whom the amount awarded should be distributed.

The "Old Settlers," or Western Cherokees, are not a gov-

ernmental body politic, nor have they a corporate existence, nor any capacity to act collectively. The money belongs to them as individual members of an Indian community, recognized as such by the treaty of 1846, and treated as distinct and separate from the Cherokee Nation, so far as necessary to enable the government to accord them their treaty rights. They are described in the fourth article of the treaty as " all those Cherokees west of the Mississippi, who emigrated prior to the treaty of 1835 "; and they may be held to include those now living who so emigrated, together with the descendants of those who have died, the succession to be determined by the Cherokee law. The petition does not set forth their names, nor the extent of the rights and interests claimed, respectively, but purports to be brought by three persons, " for themselves and as commissioners " of the Western Cherokees, and they alleged that the claimants " are the remaining part of those Cherokee Indians who formed and composed the Western Cherokee Nation; and that they have maintained their separate organization so far as to adjust and settle their claims against the United States." But the evidence is quite inadequate to justify the court in treating the immediate petitioners as appointed by all the beneficiaries as their agents to receive and disburse the amount awarded.

The lands west of the Mississippi were held as communal property, not vested in the Cherokees as individuals, as tenants in common or joint tenants; but by the treaties of 1835 and 1846 the communal character of the property was terminated as to both Eastern and Western Cherokees, and the fund, taking the place of the realty, was invested in the various ways we have mentioned, leaving the remainder to be distributed *per capita.* The Western Cherokees were paid under the treaty of 1846, simply as citizens of the Cherokee Nation, entitled to receive the money, as having emigrated prior to 1835, or the descendants of such.

The Court of Claims at first decided that the decree should be in the form usually used where a suit is prosecuted by individuals for themselves and others, that is to say, that the general liability should be established, and then provision

made for the individual Old Settlers, or Western Cherokees, to come in and establish their right to share in the fund.

It was said in *Smith* v. *Swormstedt*, 16 How. 288, 302, 303, that "the rule is well established that where the parties interested are numerous and the suit is for an object common to them all, some of the body may maintain a bill on behalf of themselves and all the others"; but that "in all cases where exceptions to the general rule are allowed, and a few are permitted to sue, or defend, on behalf of the many, by representation, care must be taken that persons are brought on the record fairly representing the interest or right involved, so that it may be fully and honestly tried." And, notwithstanding the suggestion that these so-called commissioners do not bring themselves as strictly within the rule upon this subject as they should, yet we think that they do so far represent the interests or rights involved that the case may be allowed to proceed to judgment.

The Court of Claims, after delivering its opinion, suspended the entry of the decree which it had indicated its intention to render, and after argument had upon the question, modified that opinion, and held that the fifth article of the treaty of 1846 applied as to the distribution, and entered a decree accordingly. The court was quite right in holding that the amount found due should not be decreed to be received and disbursed by the three petitioners as a commission, and that it was not necessary that the decree should require the beneficiaries to come into that tribunal and prove up against the fund. The fifth article of the treaty provided that the *per capita* allowance to be given to the Western Cherokees should be held in trust by the United States, and "paid out to each individual belonging to that party, or head of family, or his legal representatives," and "be paid directly to the persons entitled to it, or to his heirs or legal representatives," and that the persons entitled to it should be ascertained by a committee of five appointed by the President of the United States from the Western Cherokees, and an agent of the United States. The court was of opinion that the rule thus prescribed should be followed as to this balance of the amount

intended for *per capita* distribution, and it was in accordance with this view that the decree was finally entered.

We approve of this disposition of the matter as just and appropriate under the circumstances, and a competent exercise of judicial power. The court decides and pronounces the decree to be carried into effect as between the persons and parties who have brought the case before it for decision, and none the less so, because it leaves the mere matter of distribution to be conducted in the manner and through the agencies pointed out in the treaty.

The result is that we concur substantially in the conclusions reached by the Court of Claims, whose laborious and painstaking examination of the case has been of great assistance in the investigation we have bestowed upon it ; and in respect of the difference in the amount found, we direct the decree to be modified so as to provide for the recovery of the defendants of the sum of two hundred and twelve thousand three hundred and seventy-six dollars and ninety-four cents ($212,376.94) instead of the sum of two hundred and twenty-four thousand nine hundred and seventy-two dollars and sixty-eight cents, ($224,972.68,) in full of the *per capita* fund provided by the fourth article of the treaty between the United States and the Western Cherokees, dated August 6, 1846, together with interest thereon at the rate of five per centum per annum from the 12th day of June, 1838, up to and until the modification of the decree, in addition to the sum of four thousand one hundred and seventy-nine dollars and twenty-six cents, ($4,179.26); and as so modified to be

*Affirmed.*

MR. JUSTICE JACKSON did not sit in this case or take any part in its decision.