# LONE WOLF *v.* HITCHCOCK.

INDIAN TRIBES, TREATIES WITH; ACTS OF CONGRESS, IMPEACHMENT OF.

1. Where the provisions of a treaty between the Government and certain tribes of Indians, entered into in 1868, are in conflict with a subsequent act of Congress, the treaty must yield and the act be allowed its full operation and effect.
2. The courts cannot declare void an act of Congress ratifying an agreement with certain tribes of Indians, providing for the cession by them of certain lands theretofore occupied by them under a treaty with the Government, upon the ground that the agreement was procured from the Indians by fraud and deception.
3. Where tribal Indians have been assigned lands and reservations as places of domicile, they have no vested rights therein, but simply a right to occupy at the will of the Government.

No. 1109.  Submitted December 4, 1901.  Decided March 4, 1902.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, sustaining a demurrer to and dismissing a bill in equity for an injunction.                    *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Wm. M. Springer* for the appellants:

1. The law assumes that Indians may sue in the courts of the United States. U. S. R. S., Sec. 2126.

2. An Indian tribe, not being a body politic or having a corporate name, cannot sue in the name of the tribe. But one or more members of the tribe, in behalf of themselves and the other Indians interested, may file a bill to protect their rights. *Strong* v. *Waterman,* 11 Paige (N. Y.) Chancery Reports, 607; 16 Am. & Eng. Encyc. of Law (2d ed.), and numerous authorities therein cited; *Blue Jacket* v. *Comrs. of Johnson County* (Kansas Indians), 5 Wall. 737; *Seneca Nation* v. *Christy,* 162 U. S. 288–289.

Appellants were authorized by a general council of the tribes, held in the month of June, 1901, to institute any suit they might deem necessary for the purpose of preventing the wrongs and injuries against said Indians as set forth in their bill of complaint. And in the twelfth article of the Medicine Lodge treaty, by which treaty their right to the use and occupancy of these lands was secured, said Indians were treated, not as a body politic, but as individuals, who could alienate their lands only by a treaty " executed and signed by at least three-fourths of all the adult male Indians occupying the same." And said lands were " set apart for the absolute and undisturbed use and occupation of the Kiowa and Comanche tribes of Indians, and for such other friendly tribes or individual Indians as from time to time they (the said tribes) may be willing, with the consent of the United States, to admit among them."

In the *Blue Jacket Case, supra,* the chief of the Shawnee tribe of Indians, residing in Kansas, brought the suit as well for himself as all other members of the Shawnee tribe, and his right to sue in that manner was recognized and sustained by the Supreme Court of the United States in the case reported in 5th Wallace, 737. There were several other cases of like character reported in same volume, including the case of the New York Indians, in all of which the suits were brought as in the case at bar.

In the case of *Seneca Nation* v. *Christie,* 162 U. S. 288–289, *supra,* the *Strong* v. *Waterman* case, *supra,* is cited and quoted with approval.

Upon this point counsel for appellants submits that there are no adjudicated cases in this country in conflict with the doctrine laid down in the *Strong* v. *Waterman* case and the other cases above cited.

3. Where adequate compensation cannot be had at law, any person who will sustain injury by acts of an official may have an injunction to prevent such injury, and such officer cannot plead the authority of an unconstitutional law in justification of his acts.   An unconstitutional law will be treated by the courts as null and void.   *Board of Liquidation et al.* v. *McComb,* 92 U. S. 541.

4. Indians occupying lands in this country under provisions of treaties with the United States cannot be deprived of the use and occupancy of such lands without their consent, except by due process of law; and such lands cannot be taken from them except in compliance with the treaty provisions under which such lands were acquired.   The right of the Indians as to their occupancy is as sacred as that of the United States to the fee.   *United States* v. *Cook,* 19 Wall. 292–591; *Holden* v. *Joy,* 17 Wall. 247; *Wilson* v. *Wall,* 6 Wall. 89; *Chinese Exclusion Cases,* 130 U. S. 581–611; *Railroad Co.* v. *United States,* 92 U. S. 733; 16 Am. & Eng. Encyc. of Law (2d ed.), 229–233; *Society for Propagation of Gospel* v. *New Haven,* 8 Wheat. 484, 493; *Mitchel* v. *United States,* 9 Peters, 745–755; *Worcester* v. *The State of Georgia,* 6 Peters, 581; *Beecher* v. *Wetherby,* 95 U. S. 525–526.   The case at bar does not involve the political rights of appellants or of the other Indians in whose behalf this suit is brought.   It involves their property rights only.   All cases that may be cited as to the right of Congress to legislate in reference to the political rights of Indians, even in disregard of treaty provisions, are inapplicable to the case at bar.

5. Appellants cannot be deprived of their right to the use and occupancy of the lands in question without their consent, except by due process of law.

By the demurrer in this case appellees admit all the facts set forth in the bill of complaint. It is, therefore, an admitted fact in the case that appellants have not consented to sell any of their lands to the United States, nor have they consented to the opening of any of their lands to settlement by white people. Their lands have not been taken by due process of law.

Due process of law implies, in all cases, a course of proceeding according to those rules and principles which have been established in our system of jurisprudence for the protection and enforcement of private rights. It is imperative that there be a court of competent jurisdiction, a hearing, and a fair trial. 10 Am. & Eng. Encyc. of Law (2d ed.), 293, and numerous authorities therein cited. The question whether due process of law was accorded or not is judicial and not political, and the courts will always entertain jurisdiction in such a case. 6 Am. & Eng. Encyc. of Law (1st ed.), 43.

6. The property of appellants cannot be taken from them for public use without just compensation. And what is just compensation must in all cases be ascertained by a court or a commission, and a notice and opportunity for hearing must be given to the persons whose property is to be taken. This proposition is so elementary that it would be a waste of time to submit authorities in its support.

7. It was provided by section 28 of the act of Congress to organize a temporary government for the Territory of Oklahoma, approved May 2, 1890, that the Constitution of the United States shall have the same force and effect in said Territory as elsewhere in the United States.

In the case of *Downes* v. *Bidwell,* one of the Porto Rico cases decided at the last term of the Supreme Court, it was held, among other things: " That where the Constitution has been once formally extended by Congress to Territories, neither Congress nor the territorial legislature can enact laws inconsistent therewith." The Constitution provides that: " No person shall be " * * * " deprived of life, liberty, or property, without due process of law; nor shall

private property be taken for public use without just compensation." (Amendments, article 5.)

The appellants are persons within the meaning of the foregoing provision. *United States* v. *Crook,* 5 Dill. (U. S.) 453; 1 Harvard Law Rev. 149; 10 Am. & Eng. Encyc. of Law (1st ed.), 440.

The right of occupancy of lands is a property right, a right which is as sacred as the fee itself, as all authorities conclusively establish.

8. A treaty, or agreement as in this case, is a contract. Congress having amended, in several important and material provisions, the alleged Jerome treaty after it was signed by the Indians, and neither the amendments nor the treaty as amended, having been submitted to the Indians for their approval, the minds of the contracting parties have never met in approval of said treaty. It was not the agreement of the Indians. The act of Congress of June 6, 1900, which pretended to ratify an agreement with said Indians, could not give legal effect to a nonentity, or to that which had no real existence. The said act of Congress did not pretend to be other than an act to ratify and confirm "said agreement." It was, therefore, a mere *brutum fulmen.*

The alleged Jerome treaty is thus eliminated from the case. All that is left of the legislation is that which provides for the opening of the lands of the Indians to settlement by white people, the laying out of counties, town sites, the sale of town lots, and the putting of the mining laws in force, as provided in said act. These provisions were not a part of the alleged treaty, but were enacted independently of it. This brings us to the consideration of the question: "Can Congress deprive the Indians of the use and occupation of lands, secured by solemn treaty provisions, without their consent?" The authorities already cited conclusively answer this question in the negative.

Counsel for appellants respectfully submits that Congress has never, prior to the passage of the said act of June 6, 1900, passed an act which deprived Indians of the right to the use and occupancy of lands secured to them by treaty,

without their consent, except by due process of law. No
such act was cited in argument in the court below by counsel
for appellees. Counsel for appellants further submits, that
no adjudicated case has been cited, which recognizes the
right of Congress to deprive Indians of the use and occu-
pancy of lands, thus secured by treaty, without the consent
of the Indians, except by condemnation proceedings for rights
of way for railroads. All the cases cited by counsel for ap-
pellees in argument in the court below had reference to po-
litical rights only; and in none of them was there the slight-
est recognition of the newly-discovered doctrine that the
Indians in this country have no rights which Congress is
bound to respect.

*Mr. Willis Van Devanter,* Assistant Attorney-General of
the United States, for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the
Court:

The original bill in this case was filed June 6, 1901, by
Lone Wolf, describing himself as chief of the Kiowa tribe
of Indians, who sued as well for himself as all other mem-
bers of the confederated tribes of Kiowa, Comanche and
Apache Indians, residing in the Territory of Oklahoma,
against Ethan A. Hitchcock, Secretary of the Interior De-
partment, William A. Jones, Commissioner of Indian Af-
fairs, and Binger Hermann, Commissioner of the General
Land Office, to obtain an injunction against those officers.
The bill was afterwards amended, whereby Eshitie, principal
chief of the Comanche tribe of Indians, and certain other
named Indians, members of the Kiowa, Comanche and
Apache confederated tribes of Indians, residing in the Terri-
tory of Oklahoma, and delegates duly appointed by said
tribes at a general council held by them, were made parties
complainants, by leave of the court. The bill, however, is
not filed by the tribes in their tribal capacity, but only as
members of the tribes, and who claim to represent such

other members of the tribes as may come in and show themselves aggrieved by what has been done by the United States. The object of the bill of complaint is to obtain an injunction to restrain the defendants from carrying into effect and operation the act of Congress approved June 6, 1900 (31 Stat. 672, 676), amending in some respects and ratifying an agreement between the Kiowa, Comanche and Apache tribes of Indians, whereby the Indians ceded to the United States their interest in and claim to certain lands described in the agreement, and also from carrying into effect the act of Congress of March 3, 1901 (31 Stat. 1093), making further provision as to the manner of disposing of the lands so ceded.

The preliminary injunction prayed for was refused by the court below; and the defendants appearing, entered a demurrer to the bill, and the case was heard upon the demurrer. The court, sustaining the demurrer, entered a final decree dismissing the bill, on the 26th of June, 1901, and from which decree this appeal is taken.

In the view we have of this case, it is unnecessary to state with particularity all the allegations of the bill. It will suffice to state as the result of the allegations of the bill, as was clearly stated in the opinion of the court below upon the application for the preliminary injunction, that the three confederated tribes of Indians, Kiowa, Comanche and Apache, had set apart for their absolute and undisturbed use and occupation three million acres of land under treaty proclaimed August 25, 1868, which they are at present occupying, but that their possession is threatened to be disturbed by the defendants in the enforcement of the provisions of the act of Congress approved June 6, 1900; that this act of Congress is unconstitutional and void because it will deprive the confederated tribes of their lands without their consent and against their protest; that the said act of Congress of June 6, 1900, purports to ratify a prior agreement, made and signed by commissioners on the part of the United States, and by 456 Indians, dated October 6, 1892, but that the agreement has been amended and changed in material respects by the statute; that the changes had

not been submitted to the Indians signing the agreement, for their concurrence, and that, while the treaty of 1868 provided that no treaty for the cession of any portion of the reservation should be of any force against the Indians, unless executed and signed by at least three-fourths of all the male adult Indians occupying the same, yet the agreement was signed by less than three-fourths, and that those who did sign the agreement of cession were misled by representations and false translations, and did not comprehend the nature of the agreement; that from the time of the agreement down to the act of Congress mentioned the Indians repeatedly protested to Congress against the ratification of the agreement, calling its attention to these objections; and that a memorial signed by 571 Indians, who attended a general council of these tribes, which stated the substance of all these objections, was forwarded to the Commissioner of Indian Affairs, who forwarded it to the Secretary of the Interior, January 5, 1900, with the request that it be forwarded to the Committees on Indian Affairs of the Senate and House of Representatives, and it was so forwarded; that the act of June 6, 1900, and the further supplementary act of March 3, 1901, provided for the allotment to each member of the several tribes of 160 acres of land; for the setting part of 480,000 acres for common grazing purposes; for the payment of $500,000 in cash, to be distributed *per capita*, and for the retaining and investment at 5 per cent. by the United States of $1,500,000, and the payment of interest as it accrued to the members of the tribes *per capita;* and for the opening to settlement by white people, under the proclamation of the President of the United States, of the remaining portion of said original reservation, being about 2,000,000 acres; that such opening to settlement would be made, unless restrained, immediately after August 6, 1901; that the provisions of the act of June 6, 1900, under the circumstances, are unconstitutional and void, as the Indians will thereby be deprived of their lands without due process of law.

These are the most material facts alleged, though the bill contains many subordinate facts, which are set forth with great particularity; but we do not deem it essential to state them in this opinion. It is charged, as the result of the facts alleged, " that so much of said act of Congress of June 6, 1900, and so much of said acts supplementary thereto and amendatory thereof, as provide for the ratification of said Jerome treaty, the allotment of certain lands mentioned therein to members of said Indian tribes, the surveying, laying out, and platting town sites and locating county seats on said lands and the ceding to the United States, and the opening to settlement by white men of two million acres of land, were enacted in violation of the property rights of the said Kiowa, Comanche and Apache Indians, and if carried into effect will deprive said Indians of their lands without due process of law, and that said parts of said acts are contrary to the Constitution of the United States, and are void, and confer no right, power, or duty upon the said Secretary of the Interior or upon the said Commissioner of Indian Affairs, or upon the said Commissioner of the General Land Office, to do or perform any of the acts or things required to be done and performed by said pretended acts of Congress."

The grounds upon which the application for relief is based are then summarized, and reduced to four propositions, as follows:—

*First.* That the said Indians were induced to sign the said treaty or agreement of cession by false and fraudulent translations, and that none of those who signed said treaty or agreement understood its provisions.

*Second.* That by the provisions of the treaty of settlement, proclaimed August 25, 1868, no part or portion of said lands could be ceded or alienated without the consent of three-fourths of the male adult members of said tribes; and that three-fourths of such male adults have never signed the treaty or agreement of October 6, 1892, approved by act of Congress of June 6, 1900, whereby it is claimed by the United States that said Indian tribes have ceded or alienated a portion of their said lands.

*Third.* That eight months prior to the time Congress pretended to ratify the said treaty or agreement of October 6, 1892, 571 adult male members of said tribes, which were more than three-fourths of such male adult Indians of said tribes, met in general council, in said reservation, and solemnly repudiated the said treaty or agreement, and prayed Congress to reject the same, and not to accept it as their free act and deed.

*Fourth.* That in the act of Congress pretending to ratify said treaty or agreement numerous amendments, changing important provisions of said agreement, were made by Congress, and that said treaty or agreement was attempted to be put in force without submitting said amendments or the treaty as thus amended to the approval of said Indians.

Discovery is sought by answers to certain interrogatories incorporated in the bill; and the relief prayed is, that the defendants, in their official capacity, their agents or attorneys, " may be restrained by injunction from proceeding further against the complainants, and against said Kiowa, Comanche, and Apache Indians, and especially from proceeding further in allotting any of said lands to said Indians, in surveying, laying out, and platting town sites and county seats on said lands, and from opening any of said lands to settlement by white people, and generally from doing or performing any of the acts or things required by said void acts of Congress."

The argument for the complainants has been urged in support of three general propositions, that is to say:

First. That by the treaty of August 25, 1868, certain rights in the lands in question were conferred upon the Indian tribes mentioned in that treaty, of which they cannot be deprived except by their consent obtained in the manner provided for in Article XII of that instrument, and that such consent has not been obtained; but in fact, as it is alleged, the apparent or pretended consent of the Indians was obtained by fraud and deception, and that the agreement was signed by less than three-fourths of all the adult male Indians.

Second. That the right of occupancy, conferred upon the Indians by the treaty of 1868, is a vested right which can be taken away or disturbed only by due process of law, and upon the payment of just compensation; and that the agreement of cession and the act of Congress ratifying and adopting that agreement do not constitute due process of law within the meaning of the Constitution.

Third. That, as a legal consequence of the preceding contentions, if they be well founded in fact, the agreement of cession and the act of Congress ratifying the same are void, and that it is within the scope of judicial power to restrain by injunction the execution and enforcement of such void acts.

1. The first question is, what was the effect of the agreement of cession to the United States and the act of Congress thereon, ratifying and confirming the agreement, upon the treaty made with these Indians in 1868? This question admits of but one answer. So far as the provisions of the treaty and the subsequent act of Congress may be in conflict, the treaty must yield, and the act of Congress be allowed its full operation and effect. Therefore the Article XII of the treaty of 1868 cannot be appealed to as having force and operation to control the subsequent agreement of cession and the act of Congress ratifying and confirming the same. By the act of Congress of March 3, 1871 (R. S. U. S., Sec. 2079), it is provided that thereafter " no Indian nation or tribe shall be acknowledged as an independent nation, tribe or power with whom the United States may contract by treaty, but no obligation of any treaty    *    *    * prior to March 3, 1871, shall be hereby invalidated or impaired." Therefore treaties, in the international sense, are no longer the instruments to be employed in dealing with our dependent Indian tribes, but, instead of treaties, such conventions or contracts as Congress may authorize or approve. And in this case, it is not contended, as we understand counsel for the complainants, that it was not competent to Congress thus to provide as to the manner of dealing with or procuring cession from the Indian tribes men-

tioned in the treaty of 1868, in respect to the lands occupied by them under that treaty. Nor is it contended that the agreement of cession of October 6, 1892, and the act of Congress of June 6, 1900, ratifying and adopting that agreement, are not appropriate instruments for the purpose intended, within the limits and scope of the power and control of Congress over the Indians, and of the lands and reservations occupied by them under the Government of the United States; and, in the absence of all alleged fraud and imposition in procuring the agreement of cession and the act of ratification by Congress, those acts would be fully and completely effective. It is, however, alleged, and earnestly contended in argument, that there has been fraud and deception practiced upon the treaty rights of the Indians, and that by means of such fraud and deception those of the Indians who signed the agreement did so without understanding the purport and effect of the agreement, and, consequently, they have been deceived. It is alleged that less than three-fourths of the male adult Indians signed the agreement, and that those who did sign it were induced to do so by false translations and misrepresentations; and that the matter of such deception was brought to the attention of Congress before the passage of the act of ratification of the agreement of cession. These are grave charges, and if they be founded in fact, there ought to be some mode of redress for the wrong. But the question is, whether the courts can afford the redress sought in this case. Acts of Congress can only be impeached and declared void by the courts for the want of constitutional authority to enact them. If there be a doubt as to the validity of the act brought into question, that doubt must be resolved in favor of the validity of the act, and against the allegation asserting its invalidity or unconstitutionality. Nor can an act of Congress be declared void and without effect because of fraudulent or improper influences exerted in procuring its passage. It makes no difference in the effect, whether the motives that influenced the passage of the act be public or personal, honest or corrupt; the courts cannot enter into

the consideration of such questions. They are matters that pertain to legislative action exclusively, and with which courts have nothing to do. Therefore courts will not permit questions of improper legislative motives, or questions of hardship, deception, or oppression in the effect of the act, to be raised to affect the validity of the act, but they will in all cases assume that the legislature was possessed of full information upon the subject of the act, and that the motives were proper that actuated the legislature in the passage of the act in question. *Fletcher* v. *Peck,* 6 Cranch, 87, 128; *Ex parte McCardle,* 7 Wall. 506; *Doyle* v. *Ins. Co.,* 94 U. S. 535.

It is clear, therefore, that the judiciary has no control whatever over legislation, and no power whatever to question its purposes or motive, provided always that such legislation is kept within the limits of the constitutional grant of power. And from this it follows that the propriety or justice or policy of legislation, within the constitutional limits, is exclusively for the legislative department to determine; for if a court were to assume to substitute its own judgment for that of the legislature, it would at once pass beyond its legitimate sphere, and enter a field where it would be impossible to set limits to its interference, except as might be prescribed in its own discretion.

It is, therefore, a settled axiom in jurisprudence, that an act of Congress, or of the legislature, must be accepted by the courts as made and promulgated by legislative authority; and if it be within constitutional limitation, the only remedy that can be invoked for any wrong or injury resulting therefrom, must be sought from the legislative department of the Government. This principle is recognized in numerous cases, and in several recent cases in the Supreme Court of the United States. In the case of *United States* v. *Old Settlers,* 148 U. S. 427, 468, the court was required to pass, by act of Congress, upon a certain claim preferred by an Indian tribe against the United States, and in which a treaty with the Indians was involved. In that case it was sought to have the claimants relieved of certain

provisions of the treaty, because of fraud and duress alleged to have been practiced by the United States. But the court, in disposing of the contention, said: "There is nothing in the jurisdictional act of February 25, 1889, inconsistent with the treaty of 1846 (or any other), and nothing to indicate that Congress attempted by that act to authorize the courts to proceed in disregard thereof. Unquestionably a treaty may be modified or abrogated by an act of Congress, but the power to make and unmake is essentially political and not judicial, and the presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its own action or the action of the Government to judicial decision, by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference."

The same principle has been fully adopted and applied in the very recent case of *United States* v. *Choctaw and Chickasaw Nations,* 179 U. S. 494, 534, 535, where the subject is fully treated. In that case, in discussing the provisions of a treaty made by the United States with certain Indian nations or tribes, for the cession of lands to the United States, the court said: "But if the words used in the treaty of 1866, reasonably interpreted, import beyond question an absolute, unconditional cession of the lands in question to the United States free from any trust, then the court cannot amend the treaty or refuse to carry out the intent of the parties, as gathered from the words used, merely because one party to it held the relation of an inferior and was politically dependent upon the other, or because in the judgment of the court the Indians may have been overreached. To hold otherwise would be practically to recognize an authority in the courts not only to reform or correct treaties, but to determine questions of mere policy in the treatment of the Indians which it is the function alone of the legislative branch of the Government to determine."

The principle which forbids the courts from going behind a treaty or an act of Congress for the purpose of an-

nulling its effect and operation, is nowhere more clearly stated than by Mr. Justice Nelson, in the case of *Fellows v. Blacksmith et al.,* 19 How. 366, 372. In that case the contention was that the Indians were not represented by their chiefs and head men of the band in the negotiation of the treaty, and therefore the treaty was invalid. But the court said: "An objection was taken, on the argument, to the validity of the treaty, on the ground that the Tonawanda band of the Seneca Indians were not represented by the chiefs and head men of the band in the negotiations and execution of it. But the answer to this is, that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation, than they can behind an act of Congress." Citing 1 Cranch, 103; 6 Pet. 735; 10 How. 442; 2 Pet. 307, 309, 314; 3 Sto. Const. Law, 695.

The agreement of cession in this case, after it was duly ratified and confirmed by Congress, has the same conclusive force and effect as a treaty ratified and approved by the Senate; and here we have also the conclusive effect and operation of an act of Congress which the courts cannot go behind or impeach for alleged fraud and deception practiced upon the Indians in procuring from them the agreement of cession of the land in question.

This would seem to be a full answer to the application made by the bill, and we might stop here and affirm the decree of the court below. But the second ground taken in support of the claim for the relief prayed for has been urged with a good deal of earnestness, and we therefore deem it proper to give that contention brief consideration.

2. By this second ground of contention it is attempted to be maintained that the right of occupancy conferred upon the Indian tribes by the treaty of 1868, was or is a vested right of property of which they could not be divested, or cannot be deprived of the enjoyment thereof, without due process of law and upon payment of just compensation; and that the agreement of cession and the act of Congress ratifying the same do not constitute due process of law.

Clearly, there is no authority for this contention. The Indians within the United States or their jurisdiction, have, from the earliest period of the Government, been regarded and treated as the mere wards of the Government, and the lands and reservations occupied by them have been assigned to them by the United States as places of domicile for the tribes, and they hold and occupy such lands with the assent of the United States, and under their authority. Such lands and reservations are held by the Indians subject to the control and dominion of the United States, and such Indian tribes are subject to be changed from one locality or reservation to another, as may best serve the purposes and policy of the Government in the administration of Indian affairs. They have no title in the lands they occupy, except in certain cases where treaties of settlement may have conferred a title in the land; their right is simply to occupy, at the will of the Government and under its protection. As was said by the Supreme Court, in the case of *United States* v. *Kagama,* 118 U. S. 379, " The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that Government, because it has never existed anywhere else,— because the theater of its exercise is within the geographical limits of the United States, — because it has never been denied, and because it alone can enforce its laws on all the tribes." Keeping in mind, therefore, the dependent relation of the Indian tribes to the United States, and the nature of the right under which they occupy the lands assigned to them, it is quite clear there is no room for the application of the principle of due process of law as between the Indians and the United States, in a case such as the present. The question is not of a private right, but is of a public qualified right of occupancy by the Indian tribes, and no portion of the Indians can set up or assert any mere individual right as a vested right in the lands as against the Government. The power and control over the subject-matter is vested in Congress, and is there-

fore a political as distinguished from a judicial subject of inquiry. The agreement of cession and the act of Congress ratifying and adopting such agreement, stand as the deliberate legislative judgment upon the subject, and no matter what terms we may apply to those acts, whether due process of law or some other terms, the agreement of cession as ratified, and the act of Congress ratifying the same, are conclusive (*Murray's Lessee* v. *Hoboken Land Imp. Co.*, 18 How. 272, 285), and no judicial inquiry can be allowed to bring those acts into question, the subject-matter being plainly within the limit of congressional power.

Without further notice of the positions urged on behalf of the complainants, and without passing upon the motion entered by the defendants to dismiss the appeal of the appellants, we shall affirm the decree of the court below; and it is so ordered. *Decree affirmed.*

On March 6, 1902, a motion for reargument was made by *Mr. Springer* on behalf of the appellants.

On March 14, 1902, the motion was overruled, Mr. Chief Justice ALVEY delivering the opinion of the Court:

The motion for reargument in this case fails to bring to our view any matter that we have not already fully considered; and therefore we find nothing in the reasons assigned for reargument that would justify the granting the motion. We had supposed that when this court determined, as it did, that it had no power or jurisdiction to go behind the acts of Congress, ratifying the agreement of cession made by the Indians to the United States, and providing for the distribution and settlement of the lands ceded, to find grounds for declaring those acts null and void, that we had virtually decided the case against the complainants, and that their bill must necessarily be dismissed. But without making a question as to that controlling view of the case, the complainants, in their motion for reargument, have suggested that this court has not treated the title of the Indians

to the lands ceded to them by the treaty of 1868 as being anything more than a mere title by occupancy under and in subordination to the power and control of the Congress of the United States. The treaty of 1868 certainly did not vest in the Indians, either in their individual or tribal capacity, anything more than the right to occupy the lands as against the United States until it was found necessary to make other provision for them. There was no grant of estates either of freehold or leasehold; only a mere right to occupy and use the lands, according to the habits and customs of the Indians; but those rights of the Indians were sacred to them as against every one, until. Congress made provision for assuming control over the lands, and making other disposition thereof, upon such terms and conditions as Congress should prescribe.

The contention of the complainants in this respect, as stated in the brief of their counsel, is. this:

" Indians occupying lands in this country under provisions of treaties with the United States cannot be deprived of the use and occupancy of such lands without their consent except by due process of law; and such lands cannot be taken from them except in compliance with the treaty provisions under which such lands were acquired. The right of the Indians as to their occupancy is as sacred as that of the United States to the fee."

We hold that it is not a judicial question of due process of law, to be determined by the courts, but that it is a political question for the determination by Congress; and Congress having acted with all the facts before it, including the memorial and protest of the Indians against the act of ratification, that act of ratification is final and conclusive, and the courts have no power or jurisdiction over the subject.

The case is of a nature that can be taken to the Supreme Court of the United States, and we shall be greatly gratified if that high tribunal may be able to find a way for affording a remedy for what is alleged to be a grievous wrong to the Indians.

*Motion for reargument overruled.*